PIEDRAS NEGRAS BROADCASTING CO., AND/OR CIA RADIO DIFUSORA DE PIEDRAS NEGRAS, S. A., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97045. Promulgated January 14, 1941.

Robert Ash, Esq., and F. G. Rodgers, C. P. A., for the petitioner. Frank B. Schlosser, Esq., for the respondent.

300

302

(297)

**OPINION.**

DISNEY: The question presented for our consideration here is whether the petitioner, a foreign corporation organized and existing

under the law of Mexico, received during the taxable years, 1936 and 1937, income from sources within the United States within the purview of section 231 (a), (b), and (d) of the Revenue Act of 1936.[1]

The facts involved here may be summarized as follows: Petitioner during 1936 and 1937 operated a broadcasting station which was located, both as to studio and transmitting station, in Mexico. It executed in Mexico contracts to broadcast advertising programs for a consideration, either at flat rates or for a percentage of the moneys received from sales made by the advertisers resulting from the radio advertising. Some payments were made direct to Piedras Negras, Mexico, but in the case of the percentage contracts collection was made by representatives of the petitioner in Eagle Pass, Texas, where the mail which was addressed to the advertisers was received and opened by the advertisers with representatives of the petitioner. This was done in a sample room furnished free by a hotel in Eagle Pass, Texas. A part of the money of petitioner was deposited in Eagle Pass. Only such deposits are here involved. This division of the proceeds of the mail was a daily process. A typical contract recited that petitioner's mail address was Eagle Pass, Texas. About 95 percent of the monetary results of the radio advertising came from within the United States, as did about 90 percent of listeners' responses.

That the income in question was collected from advertisers within the United States is not determinative of the source. In *East Coast Oil Co., S. A.*, 31 B. T. A. 558; affd., 85 Fed. (2d) 322; certiorari denied, 299 U. S. 608, we held that though a Mexican corporation received payment for oil at its office within the United States. and though the contract was made in the United States, the source of income from the sale of the oil was not within the United States, since the title to the oil, produced or purchased abroad, passed in Mexico. The statutes there involved were the Revenue Acts of 1918 and 1921,

---

[1] SEC. 231. TAX ON FOREIGN CORPORATIONS.

(a) NONRESIDENT CORPORATIONS.—There shall be levied, collected, and paid for each taxable year. in lieu of the tax imposed by sections 13 and 14, upon the amount received by every foreign corporation not engaged in trade or business within the United States and not having an office or place of business therein, from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries. wages. premiums, annuities, compensations, remunerations, emoluments or other fixed or determinable annual or periodical gains. profits. and income a tax of 15 per centum of such amount. except that in the case of dividends the rate shall be 10 per centum, and except that in the case of corporations organized under the laws of a contiguous country such rate of 10 per centum with respect to dividends shall be reduced to such rate (not less than 5 per centum) as may be provided by treaty with such country.

(b) RESIDENT CORPORATIONS.—A foreign corporation engaged in trade or business within the United States or having an office or place of business therein shall be taxable without regard to the provisions of subsection (a), but the normal tax imposed by section 13 shall be at the rate of 22 per centum instead of at the rates provided in such section.

  *       *       *       *       *       *       *

(d) GROSS INCOME.—In the case of a foreign corporation gross income includes only the gross income from sources within the United States.

section 233 (b) which were, in effect, the same as that here applied. In *Briskey Co.*, 29 B. T. A. 987, sales of skins by a domestic corporation were consummated in India, largely to Pennsylvania corporations. We held that the income was from sources without the United States.

In *N. V. Koninklijke Hollandische Lloyd*, 34 B. T. A. 830, a foreign steamship company recovered and collected a judgment against the United States because of detention of its steamship in a port in the United States. We pointed out that the phrase "income from sources within the United States" is defined by section 119 (a) of the Revenue Act of 1932—the same, so far as here concerned, as section 119 (a) of the 1936 Act—and held that no portion of the judgment or interest constituted income from sources within the United States within the provisions of section 119 (a) (4) and section 231 (a) of the Revenue Act of 1932.

In *Helvering* v. *Stein*, 115 Fed. (2d) 468, affirming the Board, it was held that, where bankers in Germany by guaranteeing drafts drawn by their German customers on New York banks obtain funds for such customers, there was, in the profit made by the bankers, no income from sources within the United States, under section 119 (e) and (f) of the Revenue Act of 1928 (the same as in the Act of 1936, so far as here material), although the negotiation of the drafts comprised sale of personal property in the United States.

In *Nicholas Roerich*, 38 B. T. A. 567, affd., 115 Fed. (2d) 39, we considered amounts received by a nonresident alien from the United States Government for services performed in Asia, under sections 119 (c) (3) and 211 (a) of the Revenue Act of 1934. The Commissioner argued "that the amounts, being paid by the United States, were necessarily from sources within the United States," but we held that fact to be "without force against the unambiguous language of the controlling statute", which provides that gross income of a nonresident alien includes only gross income from sources within the United States and includes compensation for labor or personal services performed without the United States within income from sources without the United States. The Commissioner in I. T. 2976, C. B. XV–1, p. 138, apparently recognizes that the mere fact of payment by one within the United States does not determine the source of income to be therein, since there it is held that payment of benefit payments under the Agricultural Adjustment Act by the Secretary of Agriculture of the United States to a foreign corporation conducting all of its business of sugar cane production outside of the United States is not within the intendment of the statute. The income was said to arise "from the ownership of land * * * without the United States and constitutes income from sources without

the United States." Therefore we hold that the mere receipt of income by the petitioner at Eagle Pass, Texas, from advertisers within the United States does not determine the amounts received to be income within the United States.

The respondent seems to consider that such acts as took place in Eagle Pass, Texas, constitute doing business there and that such business indicates the source of income to be within the United States. Thus he argues that, to the extent that petitioner's income came from the division in Eagle Pass, Texas, of the moneys received by the advertisers, there was source within the United States because the sale of articles by the advertisers took place within the United States and there was joint adventure between the petitioner and advertiser for sale of merchandise in the United States. Though he does not state so expressly, we presume that he contends that this was engaging in trade or business by the petitioner and that therefore this was the source of the amounts received. It is true that in such instances the petitioner's income depended upon the amount of sales made by the advertiser, and we have no evidence as to where title to advertised articles sold passed. But even if we assume title to have passed in the United States, it does not, in our opinion, follow that the petitioner was engaged in a joint venture with the advertiser. The remittances from customer to advertiser were addressed to the advertiser. There was no contract or privity between customer and petitioner. We may, we think, reasonably assume that such remittances would generally be by check, money order, or some form other than cash. If so, the advertiser would be required either to deposit such remittances and give petitioner a check or other payment for its proportion or endorse and deliver to the petitioner checks or money orders to the extent of its contractual position. In case of cash received, it could be and was divided between advertiser and petitioner. Yet in all cases the petitioner received income, not by any dealings or contract with the customers of the advertiser, but in fact from the advertiser, pursuant to contract with him. There was no agreement for sharing losses with him, or for receipt of only a portion of his net proceeds, but petitioner received a certain portion of the gross receipts of sales made. Even a contract to share profits does not constitute one of joint adventure. A joint adventurer has the burden of the performance of the other's contracts and liability therefor. *National Surety Co.* v. *Winslow*, 173 N. W. 181. The petitioner plainly was in no such position. It contracted no liability for the expenses or defaults of the advertisers. On the contrary, the contracts expressly provided against such liabilities, e. g., expenses, patent or copyright infringement, personal injuries, slander. It did not guarantee reception. Its liability for failure to broadcast due to

negligence was pro rata return of consideration. None of the elements of joint adventure appear in the contracts made. The respondent cites no authority on the point, and suggests it only upon brief. We conclude that there was no joint venture in trade or business within the United States, and that source can not be predicated thereon.

Nor should greater effect be given to the use by petitioner of a room in the hotel in Eagle Pass, Texas, for the purpose of sorting the mail received by advertisers and dividing the proceeds of remittances received. No rent was paid for the room and no furniture or desk was owned or maintained therein by the petitioner. It was a basement sample room donated by the hotel, obviously because of the patronage realized from those in connection with the broadcasting operations. It was not an office in any usual sense. As a place of business it was only incidental—for the sorting of mail and collection of income. Regulations 94, article 231-1 (*b*), says in part:

Whether a foreign corporation has an "office or place of business" within the United States depends upon the facts in a particular case. The term "office or place of business," however, implies a place for the regular transaction of business and does not include a place where casual or incidental transactions might be, or are, effected.

Though the use of the sample room was not "casual" but daily, we think it was plainly "incidental" and not such part of petitioner's business as to indicate that the source of income was within the United States. The reason for the use of the term "incidental" by the above regulation appears to be those cases, such as *Neely* v. *Philadelphia Inquirer Co.*, 62 Fed. (2d) 873, to the effect that in order for a foreign corporation to be held to be doing business within a jurisdiction the business done must be such as to warrant the inference that the corporation is present and has thereby subjected itself to the law of such jurisdiction. See also *Erving* v. *Chicago & Northwestern Railway Co.*, 214 N. W. 12; *Temple* v. *Gates*, 56 S. W. (2d) 417. Various activities have been held not to be doing business, e. g., solicitation of business. *Maxfield* v. *Canadian Pacific Railway Co.*, 70 Fed. (2d) 982; certiorari denied, 293 U. S. 610; *Mandel Brothers* v. *Henry A. O'Neil, Inc.*, 69 Fed. (2d) 452. This, we think, indicates that any solicitation of business in the United States by W. E. Branch as "Radio Service Company" for the petitioner did not constitute doing business or indicate source of income within the United States. However, the only indication of the use of that company or name for solicitation in the United States is the fact of registration in the assumed name records of Maverick County, Texas. Internal activities of a corporation, such as holding a stockholders' meeting, do not constitute transacting business. Nor is collection of debts, nor liti-

gation to so collect, doing business. *Equitable Credit Co.* v. *Rogers*, 299 S. W. 747; *Continental Assurance Co.* v. *Ihler*, 26 Pac. (2d) 792. That Maverick County, Texas, was made the venue of any litigation over the contracts, is therefore immaterial. No litigation is shown by the record. In *Wells Fargo & Co. of Mexico, S. A.* v. *McArthur Brothers Mercantile Co.*, 26 Pac. (2d) 1021, it was held that the using of mail and telegraph facilities in Arizona by a Mexican corporation did not constitute doing business therein and did not give Arizona courts jurisdiction over the Mexican corporation. The decision was not affected by the fact that the Mexican corporation employed a Mexican broker to effect transfer of express from Arizona to Mexico and that the broker in revising and classifying express used a room maintained by the Mexican corporation adjoining the American company's office in Arizona. We conclude that the use of the sample room in Eagle Pass, Texas, for collection of payment for broadcasting advertising was not such activity as to indicate the source of income was within the United States. The same conclusion applies to the fact that moneys received were deposited in banks in Eagle Pass, Texas. The mere deposit of money is not transaction of business. *Cottonwood Coal Co.* v. *Junod*, 236 Pac. 1080; *People* v. *Knapp*, 128 N. E. 892. That the contracts placed in evidence indicated, in the heading thereof, that petitioner's mail address was Eagle Pass, Texas, can not be given different effect. Assuming what is not shown by the record, that petitioner received mail there, it would be only an incidental matter and not constitute such business activity as to demonstrate source of income.

We have now examined the activities carried on in the United States, with reference to their effect as indicating source of income, except the broadcasting itself. Does radio broadcasting of advertising from a studio and power station outside of, but through the ether over, the United States (as well as elsewhere), resulting in income to the foreign corporation so broadcasting from advertisers' paying for such advertising constitute a source of income within the United States?

The necessary plant and equipment for broadcasting the various programs put on the air were located in Mexico, just across the river from Eagle Pass, Texas. From this point the radio waves or impulses were transmitted across the international border, primarily for reception in the United States. All contracts for such broadcasts were signed or executed in Mexico and, by virtue of such contracts and the broadcasts pursuant thereto made from the station in Mexico, petitioner received income. Income has been defined as the gain derived from capital, from labor, or from both combined, or from the sale or conversion of capital assets. *Eisner* v. *Macomber*,

252 U. S. 189. In Paul and Mertens' Law of Federal Income Taxation, vol. 4, p. 350, it is said, in part:

\* \* \* It [the "source"] is not a place, it is an activity or property. As such it has a situs or location; and if that situs or location is within the United States the resulting income is taxable to nonresident aliens and foreign corporations. \* \* \* Thus, if an income be taxed, the recipient thereof must have a domicile within the jurisdiction, or the property or activities out of which the income issues or is derived must be situated within the jurisdiction so that the source of the income may be said to have a situs in this country. The basic rule is that the consideration for taxation is protection of life and property and that the income rightly to be levied upon to defray the burdens of the United States government is that income which is created by activities and property protected by this government. \* \* \*

That the Commissioner has recognized this rule, see T. D. 3111, C. B. 4, p. 280, of which the language last above quoted is in part, in effect, a paraphrase.

The question of whether a foreign corporation does business within the United States and is subject to income tax in the United States merely by broadcasting from its foreign station programs designated for listeners in the United States, as a result of which income is received because of payments for advertising broadcast, has never, so far as we are advised, or can ascertain, been judicially determined. In *Hoffman* v. *Carter*, 192 Atl. 825, affirming 117 N. J. Law 205; 187 Atl. 576, the court, after holding that the Columbia Broadcasting System, Inc., had not been served with process, said:

\* \* \* We reserve decision as to whether the delivery at radio receivers in this state of programs transmitted by the Columbia Company from its New York studio in any sense or to any degree constituted the doing of business by it in this state.

However, that case involved no broadcasting by the Columbia Broadcasting System, Inc., which did not own or operate a radio station, but used leased wires to carry its programs from city to city, and owned and operated another company which held a license to broadcast and did broadcast the programs from a station within New Jersey, the jurisdiction involved. It was held that such ownership of the company which owned the local station and the furnishing of programs to it was not doing business in New Jersey. The petitioner's activities were involved in *W. E. Branch*, 38 B. T. A. 1139, but that proceeding covered years prior to the discontinuance of the studio at Eagle Pass, and the only question was the liability of W. E. Branch as withholding agent. The proceeding therefore affords no help here.

The record in this case does not contain any technical or engineering evidence as to the mechanics of the process of radio broadcasting.

In *Fisher's Blend Station, Inc.* v. *State Tax Commission*, 297 U. S. 650, it is said:

Broadcasting, according to the allegations of the complaint, is accomplished by the generation, at the broadcasting station, of electro-magnetic waves, which pass through space to receiving instruments which amplify them and translate them into audible sound waves. The essential elements in the broadcasting operation are a supply of electrical energy, a transmitter, the connecting medium or "ether" between the transmission and receiving instruments, and the receiving mechanism.

That case holds that radio broadcasting is interstate commerce and that a state occupation tax measured by gross receipts, where no income was allocable to intrastate commerce, was an unconstitutional burden on interstate commerce. The respondent apparently views it as authority that such broadcasting is doing business within the different states covered; but "commerce" and "doing business" are not analogous terms, the former being much broader in its application than the latter. "Doing business" between citizens of different states is "commerce", but all commerce between them may not be "doing business." Since the decision merely involves the ordinary question as to what activity so far traverses state lines as to cause application of the commerce clause of the Constitution of the United States, we do not find it helpful upon the present question, which is not whether business or commerce is carried on, but where the source of income is, in the United States or outside.

In a later case, *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250, the Court held valid a law of New Mexico imposing a tax upon gross receipts from sale of advertising space by those engaged in publishing magazines, though the distribution of the magazines was interstate commerce. The Court held the business of providing and selling advertising space to be local. We think the petitioner here was likewise engaged in a local business of providing and selling advertising space on its programs and that, just as the Court in the cited case called the burden on interstate business "remote" and "attenuated", the use of the ether over the United States (as well as elsewhere) does not conceal the fact that the locale of petitioner's source of income was in Mexico.

In *International Textbook Co.* v. *Pigg*, 217 U. S. 91, the Court held that a correspondence school in Pennsylvania was engaged in interstate commerce in imparting instruction by correspondence from its offices in Pennsylvania to students in Kansas, transportation of its publications, and use of agents to procure and forward applications and payments; but it did not conclude that, merely because of such interstate commerce, business was done in Kansas within the statutes of that state requiring foreign corporations doing business to file a statement with the Secretary of State, but separately examined the

facts to determine that question. It thus appears that interstate commerce does not *ipso facto* demonstrate the transaction of business within a state affected.

That there is some actual physical effect in the United States produced by the passage of broadcasted programs, can hardly be denied; for it is common knowledge, and we take judicial notice, that one station may interfere with another station. This fact is, in effect, one of the reasons for licensing radio stations by the Federal Communications Commission. *United States* v. *American Bond & Mortgage Co.*, 31 Fed. (2d) 448. Interference with Station WOW of Omaha, Nebraska, by the petitioner's station, XEPN, was one of the facts recited by the Federal Communications Commission in denying the application for a license to broadcast programs from a studio in Eagle Pass, Texas, through XEPN. The interesting question then arises whether such physical effect within the United States is such as reasonably to indicate business transacted therein and source of income therein. The business of another station in the United States may be interfered with by the interference in reception of broadcasts. But does that indicate that business is done in the United States, or that the source of income is therein? In *United States* v. *American Bond & Mortgage Co.*, *supra*, the court, discussing the contention that regulation of broadcasting is taking private property, says:

> Just what is the property right which is claimed for the broadcaster when it is subjected to analysis? When we speak of wave lengths or frequencies, we are dealing with intangible things, about which we really know nothing at all, except as we perceive the effect produced in an electrical device. The waves, it seems, are in some kind of a medium which permeates every particle of matter. Their effect is produced in and upon the property of others. There is no real analogy between this unknown medium and the air or the water. In one aspect, the waves may be treated as intruders. Whatever rights may exist among these intruders in their relations with each other, there certainly is no property right which can be asserted against the right of those upon whom the intrusion is made to have the intruders come "by cold gradation and well-balanced form," and not in a mob. In the very nature of things, there can be no right to the use of any particular frequency or wave length, or of the ether as against the legitimate exercise of the regulatory power of the United States.

It thus appears that broadcasting through the ether does not in any ordinary sense cause contact or interaction between properties of different owners, such as transaction of business usually entails, and that the foreign broadcasting corporation here can not be said to be using property in the United States. Shipping goods into a state is not doing business therein. *Novelty Manufacturing Co.* v. *Connell*, 34 N. Y. S. 717; nor is sale by solicitor, transportation of merchandise into a state, and collecting therefor, *Bruner* v. *Kansas Moline Plow Co.*, 168 Fed. 218; nor distributing a magazine by a foreign corporation, *System Co.* v. *Advertisers' Cyclopedia Co.*, 121 N. Y. S. 611.

If these physical activities do not constitute transaction of business within a state, we think that mere broadcasting through the ether over a state is not such.

There is some indication in the record that the petitioner regarded the broadcasting as resulting in income. One contract recites that petitioner is to receive "Fifty cents out of every dollar sale made *as a result of radio advertising*", while another refers to "Fifty percent of any monies received *as a result of the broadcast.*" (Italics supplied.) The expressions are, however, obviously rather loose language and we think that even a conclusion by the parties on the present question as to whether the broadcasting of advertising was done in the United States can hardly fairly be drawn therefrom. At any rate, it would be at most a conclusion.

The gain or income which the petitioner received from persons residing in the United States was effected or produced to the extent of about 95 percent thereof by reason of the contracts with United States advertisers and as the result of petitioner's broadcasting from its station at Piedras Negras, Mexico, intended primarily for the reception of listeners in the United States, pursuant to the terms of its contracts with the advertisers. But for the contracts entered into in Mexico, the radio station therein, and the broadcasts from Mexico, no gain or income would have been realized or received by petitioner from the advertisers in the United States. The property, the power station, and the activities, the radio entertainment at the studio, which originated broadcast programs and advertising, all were in Mexico and without the jurisdiction of the United States. T. D. 3111, *supra*, on the subject "Income from Sources within the United States Defined", says in part: "A merchant exercises his trade where he has his principal place of business, viz., where his profits come home to him." In *Lord Forres*, 25 B. T. A. 154, 161, examining the meaning of "sources within the United States" under sections 213 (c) and 217 (a) of the Revenue Acts of 1921 and 1924, we said:

* * * The commonly accepted definition of the term "source" is "that from which anything comes forth, regarded as its cause or origin, the first cause." Webster's New International Dictionary. * * *

Certainly labor and personal services, both in the radio programs themselves and in the operation of the power station or broadcasting plant, contributed in a major degree to the dissemination of the advertising. Such labor and personal services were wholly without the United States. Section 119 (c) (3) of the Revenue Act of 1936 lists as gross income from sources without the United States "Compensation for labor or personal services performed without the United States." The mechanical appliances to which such labor and services were to produce broadcasting the advertising were also wholly in Mexico. Mexico was the situs of the "device" which "pro-

duces energy which reaches every part, however small, of the space affected by its power." *United States* v. *American Bond & Mortgage Co., supra.* The initiation of such impulse seems truly the first cause in this matter. The transmission of the impulse through the ether over the United States and reception at receiving sets therein seem to be intermediate steps in the process, and not the source. Any activity within the United States is secondary, not primary. We are unable to discern, in the mere fact of broadcasting across the ether over the United States, that capital or labor was employed therein, or that an activity took place therein which can truly be said to be the source of the income here involved. The source, we think, was the studio and power plant or broadcasting station in Mexico and the labor there employed. With and through them, as instrumentalities, the petitioner employed capital and labor, and earned its income. It had no expense within the United States under Regulations 94, article 119–13 (1), p. 298. Without them no effect would have been secured upon receiving sets and the advertisers' customers in the United States. The United States has no power to regulate or control the petitioner's broadcasting activities, which occur and are exercised in Mexico. *McCulloch* v. *Maryland*, 17 U. S. 316, says:

> \* \* \* All subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation. This proposition may almost be pronounced self-evident.

The subject matter of the tax is in Mexico. *Hart* v. *Tax Commissioner*, 132 N. E. 621. The United States extends no protection to such activities or the petitioner's property. On the contrary, it licenses interfering broadcasters.

Neither broadcasting nor the other facts above examined come within the items which section 119 of the Revenue Act of 1936 enumerates as to be treated as income from sources within the United States, viz., interest, dividends, personal services, rentals, royalties or sale of property, real or personal.

Under the facts as found herein and authorities cited, we are of the opinion and hold that the amounts of income received by the petitioner were not from sources within the United States in the taxable years, 1936 and 1937, and therefore are not subject to income tax in those years. The Commissioner's action in asserting income and excess profits taxes and delinquency penalties against the petitioner, as heretofore herein set forth, is therefore disapproved. This conclusion renders it unnecessary to pass upon other issues as to deductions, returns, and penalties.

No question has been presented in this proceeding as to whether the income may have been partly from sources within the United

States and partly from sources without the United States; nor has there been any contention presented as to whether radio broadcasting constitutes "services rendered partly within and partly without the United States," within the language of section 119 (e) (1) of the Revenue Act of 1936. Apparently there has been no allocation of income to sources within or without the United States under rules and regulations prescribed by the Commissioner, within the intent of section 119 (e) of the Revenue Act of 1936. Since the contention between the parties here is simply whether, as contended by petitioner, the income was from sources without the United States to a nonresident foreign corporation, or, as contended by the respondent, from sources within the United States to a resident foreign corporation, our opinion is devoted only to that question.

Reviewed by the Board.

*Decision will be entered for the petitioner.*

STERNHAGEN, MURDOCK, TURNER, MELLOTT, ARNOLD, and OPPER dissent.