TOPPS OF CANADA, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72569.    Filed May 23, 1961.

*I. Robert Rozen, Esq.,* and *Samuel Brodsky, Esq.,* for the petitioner.
*Charles M. Greenspan, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year ended July 31, 1955, in the amount of $2,925.53.

The only issue is whether during the year in question the petitioner qualified as a Western Hemisphere trade corporation within the meaning of section 921 of the Internal Revenue Code of 1954, and is, therefore, entitled to the special deduction provided by section 922 of such Code.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioner is a domestic corporation, organized on November 26, 1951, under the laws of the State of New York, and having its principal place of business in New York City. It filed its Federal income tax return for the year in question with the director of internal revenue for the second district of New York.

The stock of the petitioner is owned equally by Marvin Mandel, his four brothers, and another individual. Manco Watch Strap Company, Inc. (hereinafter called Manco), is a New York corporation, established in 1935, and is owned entirely by the five Mandel brothers. It operates a watch band business in the United States. During the taxable year the petitioner and Manco occupied the same premises in New York City. The Mandel brothers, who lived in the United States, served as officers of both Manco and petitioner.

Prior to the organization of the petitioner Manco had shipped goods to Canada, but at the suggestion of two Canadian variety store chain companies, F. W. Woolworth & Company, Ltd., of Canada and the Kresge Co., the petitioner was set up to carry on a watch band business in Canada. The principal reason for establishing the petitioner in the market in Canada was to save Canadian duties, which would otherwise have been imposed on the importation of goods into Canada. In addition, better service could be rendered to Canadian customers by having a Canadian office.

During the year in question the petitioner maintained a factory in Canada where it processed and manufactured watch bands and allied articles for distribution exclusively in Canada. Approximately 85 percent of the business in the year in question consisted of selling watch bands. Petitioner engaged principally in selling low-priced watch bands, retailing from 25 cents to $1.98, its business being based on low cost, fast turnover, and large volume. The sales were made principally through the popular mass outlets, such as variety stores and drugstores and to the wholesale trade, which in turn sold to independent stores of all kinds. In addition, some sales were made to organizations such as mail-order houses, which used petitioner's products as free premiums. The petitioner also sold goods by direct mail advertising directed from petitioner's Montreal office.

The remaining approximately 15 percent of petitioner's business consisted of the sale of identification bracelets, neck chains, key chains, and kiddie costume jewelry of the kind sold in 5 and 10 cent stores. The petitioner also sold flashlights which originated principally in Japan, which constituted about 5 percent of its business. The same distribution channels and salesmen were used to market and distribute these articles as were used to market and distribute watch bands. The petitioner's manufacturing facilities, personnel, and packaging equipment in Canada were easily adapted to these items, and were so used. Petitioner's reason for engaging in the flashlight business was to augment its line of goods and to produce additional income for its salesmen. The petitioner employed manufacturers' representatives who sold more than one line of goods.

At petitioner's Canadian plant the operations performed consisted of manufacturing, assembling, packaging, and distributing the articles which it sold. The equipment in the plant was not elaborate, consisting of conventional types of manufacturing machines and handtools used in jewelry subassembly, including pliers and hand-tools, foot presses, kick presses, handpresses, clamping tools, polishing machines, a scratching machine, and packaging equipment. With respect to watch bands, the operations included subassembly of the component parts, such as the chain and the expansion center, the latter originating in Hong Kong. The bands would then be sent out for electroplating, and then finished, packaged, and distributed. Most of the expansion bands had stainless steel backs and after the electroplating it was necessary to remove the electroplating from the back of the band.

The packaging of petitioner's products was an essential part of its operations, since they had to be presented in an attractive way to induce impulse sales. All the operations having to do with assembly, finishing, packaging, and displaying petitioner's products were performed in Canada.

During the year in question the petitioner employed in Canada, aside from its officers, between 9 and 19 employees and about 6 home-workers, in addition to 4 to 7 salesmen. One of such employees was the manager of the plant, another was a clerical worker, and another was the factory foreman. All of the others shared in duties which included the operation of the various machines and assembling, packaging, and shipping.

Except for the officers, all the employees were Canadians. The manager was a Canadian, bilingual in French and English. He remained in Canada part of the time. Although the petitioner's officers lived in the United States, they made trips periodically to Canada and participated in that portion of the business in which they were specialists.

The petitioner employed four sales agencies, and also salesmen who covered the four principal areas of Canada, namely, the Maritime Provinces, the Montreal area, the midwestern area, and the far eastern area. These salesmen radiated out several hundred miles from their homes, selling goods to variety stores, wholesale jobbers, mail-order jobbers, hardware stores, and watch assemblers, who in turn sold only to Canadian customers. When a salesman obtained an order, the standard operating procedure required the order to be returned to the Montreal office for processing and shipment.

Inventories of petitioner's products from which orders were filled were maintained only in Montreal, Canada. All goods sold by petitioner were paid for in Canadian dollars or by draft on the customer's Canadian bank.

The petitioner conducted trade advertising in Canada in various Canadian publications for variety stores and other retail outlets, and consumer advertising in various Canadian publications printed in French or English.

The petitioner had extensive and severe competition in Canada. There were about 25 to 30 companies engaged in either manufacturing or selling in Canada watch bands of foreign manufacture. Watch bands were brought into Canada from Germany, France, England, the United States, Japan, and Hong Kong. Some of these competitive companies were French and British companies.

The petitioner's net purchases of merchandise, parts and sections, packaging and display materials, electroplating, certain assembly subcontracting expense, freight, and customs expense for the taxable year in question totaled $306,252.24. Of such amount, $55,726.23 worth of goods was ordered from Japan on an f.o.b. basis, and title to such goods ordered from Japan passed to the petitioner in Japan. Of the purchases, $118,610.28 came from Hong Kong, of which amount $23,466 was ordered f.o.b. Hong Kong, and $95,144.28 was ordered

c. & f. New York (cost and freight to New York). The petitioner maintained insurance on goods in transit.

Prior to the organization of the petitioner, its officers had a thorough knowledge of the kind of articles that could be produced in Hong Kong and Japan, the prices therefor, and the methods of purchasing.

The petitioner dealt with one company in Hong Kong and two companies in Japan. These were all very large companies. Employees of those companies frequently made trips to the United States and visited the petitioner during their course of business, at which time the petitioner's representatives discussed with them the watch band business and related items.

The reason the petitioner purchased these goods in the Eastern Hemisphere, rather than the Western Hemisphere, was that the cost of the goods in the Western Hemisphere would have been prohibitive and the petitioner would not have been in a good competitive position.

All orders for goods originating in Hong Kong and Japan were sent from petitioner's Montreal or New York office. Most of the orders were made by cable; the remaining orders were made by mail. All goods originating in Hong Kong and Japan were ordered by petitioner on the basis of a sample, except to the extent that the order represented a repeat order, in which case the term "as had" was used.

Confirmation of the orders was always sent back to the petitioner by the foreign companies. This was important to the petitioner, since the specifications of the articles were complex as to size, color, assortment, and packaging, and the time of delivery was crucial. The confirmation was generally signed by the petitioner in New York, and this finalized the order and confirmed the price, the article, and the delivery date. The confirmation would then be returned by petitioner to the Hong Kong or Japanese company. The petitioner held such companies responsible for delivery of the goods in accordance with the confirmation.

All payments made by the petitioner to the Hong Kong Company were made to that company's correspondent in New York. Such payments were made in United States dollars against a sight draft with documents attached. It was the general practice of petitioner to make such payment while the goods were in transit. In the case of purchases originating in Japan, payments were made by petitioner on the basis of a letter of credit which was established in New York, and payment was made in United States dollars.

Except for goods which originated in Hong Kong and Japan, all other goods purchased by petitioner originated in the Western Hemisphere.

The f.o.b. orders which the petitioner placed in Hong Kong contained the following language:

Please purchase for us from [name of company] the above items at the above prices. For your services in acting as our agent in making the purchase we will pay you a commission of 5%.

Some of the orders placed by petitioner f.o.b. Japan contained similar language.

A typical confirmation sent by the Hong Kong company in response to petitioner's f.o.b. Hong Kong orders calls for the "Buyer's Signature" and the "Seller's Signature." The Hong Kong company signed as seller.

The 5 percent commission above referred to was based upon the f.o.b. value. This was consideration paid to the Hong Kong company for handling the order, seeing that petitioner got suitable merchandise, inspecting it, packing it, shipping it, financing the suppliers, and corresponding with the petitioner. It was responsible for the goods in the event that anything was wrong and there were occasional instances of shortages or defective goods in which some adjustments were required. The commission charges were the subject of separate debit notes sent by the Hong Kong company to the petitioner and paid by the latter. The commission was billed separately, on advice of counsel to petitioner, in order to relieve this payment of Canadian duty. The Canadian duty is based upon the ex-factory price and recognizes that the portion paid for services which have been rendered is nondutiable.

The petitioner regarded the Hong Kong company and the Japanese companies as the sellers of the goods which petitioner purchased or as commission merchants, and did not consider those companies as its agents. The commissions were regarded by petitioner as part of the purchase price of the goods. Petitioner also considered this 5 percent as part of the profit of such foreign companies. The Hong Kong company also made sales to petitioner's competitors, but petitioner was unable to exert any control over such sales. Petitioner never gave the companies in Hong Kong and Japan any power of attorney, and they never contracted in petitioner's name.

A typical order issued by the petitioner on "C. & F. New York" terms is labeled "PURCHASE ORDER" and calls for the "BUYER'S SIGNATURE." A typical confirmation sent by the Hong Kong company in response to petitioner's "C. & F. New York" orders is labeled "SALE CONFIRMATION" and calls for the "Buyer's Signature" and the "Sellers' Signature," and the Hong Kong company signed as seller. It contains the following statements:

We confirm sale to you of the following goods, subject to contingencies beyond our control, and shall be obliged if you will sign and return to us the duplicate in acknowledgment of your purchase.

\* \* \* \* \* \* \*

NOTE:—Sellers will not be bound by any conditions, rebates, or any other matters which are not expressly contained in their contracts.

> Any alteration in Freight, Marine Insurance or War Risk Rates for buyers account.

The petitioner was advised that these foreign companies engaged in foreign exchange transactions involving the conversion of United States dollars paid by petitioner to them into foreign exchange at favorable rates. It was also customary for such foreign companies to advance moneys to the suppliers of the goods as they were being manufactured, and final payment to the sellers would be made upon final delivery of the goods to them. The petitioner never received any money from these companies as a result of such transactions.

During the year in question the petitioner did not have in Hong Kong or Japan any employees, office, plant, equipment, telephone, telephone listing, or storage facilities. It did not register to do business there, nor did it file suit upon any matter or file tax returns there.

The petitioner's gross receipts from all sources for the year in question totaled $505,385.19. For the 3-year period immediately preceding the close of the taxable year in question, 95 percent or more of the petitioner's gross income was derived from sources without the United States, and 90 percent or more of its gross income was derived from the active conduct of a trade or business.

In its return for the taxable year ended July 31, 1955, the petitioner claimed a deduction for Western Hemisphere trade corporations in the amount of $11,453.72.

In the notice of deficiency the respondent disallowed the claimed deduction of $11,453.72 on the ground that the petitioner did not qualify as a Western Hemisphere trade corporation within the meaning of section 921 of the Internal Revenue Code of 1954.

## OPINION.

There is no question that 95 percent or more of the gross income of petitioner was derived from sources without the United States and that 90 percent or more of its gross income was derived from the active conduct of a trade or business, as required for qualification under section 921 of the Internal Revenue Code of 1954.[1] The only

---

[1] SEC. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS.

For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

   (1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

   (2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

For any taxable year beginning prior to January 1, 1954, the determination as to whether

question is whether the petitioner meets the requirement that all of its business (other than incidental purchases) was done in countries of the Western Hemisphere.

The respondent, in support of his determination that the petitioner did not qualify as a Western Hemisphere trade corporation in the year in question, argues on brief that the facts show that as an integral part of its business operations the petitioner made purchases of merchandise outside the Western Hemisphere in excess of 34 percent of its gross receipts and that therefore such purchases were not "incidental" as that term is used in section 921 of the Code and in section 1.921–1 of the Income Tax Regulations promulgated thereunder.[2] It is his position that it has been judicially established that sales occur when beneficial ownership and title to the goods pass to the purchaser and that it is the situs of that event which determines where the sales take place (citing *American Food Products Corpo-*

any corporation meets the requirements of section 109 of the Internal Revenue Code of 1939 shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning prior to January 1, 1954.

SEC. 922. SPECIAL DEDUCTION.

In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

'(1) First determine the taxable income of such corporation computed without regard to this section.

,(2) Then multiply the amount determined under paragraph (1) by the fraction—

(A) the numerator of which is 14 percent, and

(B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.

[2] Section 1.921–1 of the regulations provides:

* * * The term "incidental purchases" as used in section 921 and this section does not have the same meaning as the phrase "purchases incident to the conduct of the business". The term "incidental purchases" means only purchases (of any kind and for any purpose) which are (i) minor in relation to the entire business or (ii) nonrecurring or unusual in character. Whether purchases made outside the Western Hemisphere are incidental purchases for purposes of section 921 and this section shall be determined on the basis of all the facts of each particular case, except that in any case in which the aggregate of the purchases (of any kind and for any purpose) made outside the Western Hemisphere for the taxable year does not exceed an amount equal to 5 percent of the corporation's gross receipts from all sources for such taxable year, such purchases shall be deemed to be incidental purchases. Merely incidental economic contact with countries outside the Western Hemisphere will not disqualify a corporation as a Western Hemisphere trade corporation. * * *

*  *  *  *  *  *  *  *

*Example (1).* X, a domestic corporation, operates a mine in South America, and ships its products to England. The fact that X retains title to such goods until acceptance of the bill of lading and draft, solely in order to insure collection, will not cause X to be considered as carrying on business outside the Western Hemisphere, since such passing of title is merely an incidental economic contact outside the Western Hemisphere.

*Example (2).* Y, a domestic corporation, is engaged in Argentina in the business of manufacturing and selling construction equipment. During 1956, Y purchased in Germany certain motor parts required as an integral part of the equipment which it makes. The amount of such purchases equalled 4 percent of Y's gross receipts for 1956. Such purchases are incidental purchases and do not disqualify Y as a Western Hemisphere trade corporation.

*Example (3).* Z, a domestic corporation, operates a mine in South America. During 1956, Z, in accordance with its usual practices, purchased in France machinery and equipment necessary in the conduct of its business. The amount of such purchases was not minor in relation to Z's entire business. Such purchases disqualify Z as a Western Hemisphere trade corporation.

*ration*, 28 T.C. 14; to the same effect are *Barber-Greene Americas, Inc.*, 35 T.C. 365; and *A. P. Green Export Company* v. *United States*, 284 F. 2d 383), and that necessarily the same test establishes where purchases are made.

The petitioner's net purchases of merchandise in the year in question amounted to $306,252.24, of which amount $174,336.51 originated in Hong Kong and Japan. Of this amount, $55,726.23 represented goods ordered from Japan on an f.o.b. basis and it has been stipulated that title to such goods passed to the petitioner in Japan. Included also were purchases, originating in Hong Kong, in the amount of $23,466 f.o.b. Hong Kong and $95,114.28 c. & f. New York. Apparently the petitioner does not question that title to these goods also passed to it in Hong Kong, since on brief it states that it bore the risk after the goods were on board the vessels for transportation to the Western Hemisphere. As pointed out in *United States* v. *Balanovski*, (C.A. 2) 236 F. 2d 298, in f.o.b. and f.a.s. contracts there is a presumption that title passes from the seller just as soon as the goods are delivered to the carrier "free on board" or "free alongside ship," and there is no evidence in the instant case to show that there was an intent on the part of the petitioner and the foreign companies that title should pass at a different time. Thus, the petitioner purchased goods, title to which passed outside the Western Hemisphere, at a cost which represents well over half the cost of all purchases and over 34 percent of the petitioner's gross receipts of $505,385.19 for the year in question.

The petitioner has shown in detail the manner of its operations, most of which were conducted in Canada. It points out that it had no establishment or employees in Hong Kong and states that its relations with the purchasing companies in those places did not amount to its being present and doing business there on any theory of agency. It contends that, within the meaning of section 921 of the 1954 Code, all of its purchases, including those originating in Hong Kong and Japan, were made in Canada or the United States. This is based upon the premise that section 921 of the Code does not mean that the mere purchase of goods outside of the Western Hemisphere amounts to doing business, and that the words "other than incidental purchases" means "other than purchases incident to its business." In support of this view, the petitioner cites a number of cases arising under other sections of the Code, which hold that for certain purposes the mere purchase of goods does not amount to carrying on business.[3] It is argued that the mere fact that the place

---

[3] It cites, for example, *Union Internationale De Placements* v. *Hoey*, (C.A. 2) 96 F. 2d 591, which held that for purposes of the capital stock tax a foreign investment company buying and selling securities in the United States through domestic banks and brokerage firms was not doing business in the United States; *Piedras Negras Broadcasting Co.*, 43 B.T.A. 297, affd. (C.A. 5) 127 F. 2d 260, which held that a foreign corporation operating a radio broadcasting station in Mexico and receiving income from advertisers in the United States, was not in receipt of income from the United States under section 119

of passage of title to goods may be determinative of the source of income from such sales for purposes of the other requirements of section 921, has no relevance in determining whether all of a corporation's business is done in the Western Hemisphere. The point is also made by the petitioner that Congress, in connection with the enactment of section 109 of the 1939 Code, stated, through its committee reports,[4] that mere incidental economic contact with other countries outside the Western Hemisphere, for example, the shipping of goods outside the Western Hemisphere and retaining title in order to insure collection of the selling price, is not to be considered as carrying on business outside the Western Hemisphere, and that this has been recognized in the regulations. It is argued that, consistently, the purchase of goods from sources outside the Western Hemisphere, even though title is taken abroad, should not be considered as doing business there, but, rather, should be considered as nothing more than incidental economic contact with countries outside the Western Hemisphere, and that such purchases should not defeat the petitioner's classification as a Western Hemisphere trade corporation.

It is urged by the petitioner that the regulations should be construed in accord with its views above described, and that so construed the petitioner is entitled to classification as a Western Hemisphere trade corporation; but that if such regulations be construed as meaning that purchases such as were made by the petitioner constitute doing business outside the Western Hemisphere, the regulations are invalid as being contrary to the intent of the statute.

It seems to us that the literal language used by Congress in section 921, namely, "business (other than incidental purchases)," indicates that Congress considered, for purposes of that section, that purchases constitute a part of a corporation's business activity. It also seems to us that the word "purchases" cannot be considered, as contended by petitioner, as referring only to purchases made abroad by agents or employees who are physically there representing the corporation. Accordingly, we are of the opinion that prior decisions cited by the petitioner, which hold that for purposes of other provisions of the Code the making of purchases alone does not constitute doing business, are not authority for holding that the purchases made by the petitioner in Hong Kong and Japan are to be disregarded in deciding whether petitioner qualifies under section 921.

---

of the Revenue Act of 1946, since the services were rendered outside the United States and the foreign company was not physically present or carried on any activity in the United States; and *Scottish American Investment Co., Ltd.,* 12 T.C. 49, in which it was held that a foreign corporation engaged in cooperative management of foreign capital, and which invested a large part of such capital in American securities through transactions effected principally through resident brokers, was not engaged in trade or business within the United States within the meaning of section 231 of the Internal Revenue Code of 1939.

[4] See S. Rept. No. 1631, 77th Cong., 2d Sess. (relating to the revenue bill of 1942).

There remains the question of the proper construction of the term "incidental purchases." The statute itself does not define the term, and the committee reports with respect to the revenue bill of 1954 do not provide the answer.[5] They merely state, in effect, that in order to correct an obvious inequity which had arisen in the administration of the Western Hemisphere trade corporation provisions, a change was being made to provide that "incidental purchases made outside of the Western Hemisphere" will not disqualify a corporation if it is otherwise eligible. Such reports do not give examples of the administrative action which was considered inequitable.

While the term "incidental purchases" might be susceptible of the construction urged by the petitioner (purchases incident to its business), it certainly is not clear that such was the construction intended by Congress.[6] On the other hand, it appears to us that such language is reasonably susceptible of the construction placed upon it in the regulations, namely, purchases which are minor in relation to the entire business or nonrecurring or unusual in character. Such regulations specifically reject the construction of the statute urged by the petitioner.

The Supreme Court has many times held that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes, and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496. It has also been stated by the Supreme Court that the practical interpretation of an ambiguous or doubtful statute that has been acted upon by officials

---

[5] In H. Rept. No. 1337, 83d Cong., 2d Sess., it is stated:

Although your committee believes that the present Western Hemisphere trade corporation provisions produce some anomalous results, it has retained those provisions in order to avoid any disturbances at the present time to established channels of trade. However, to correct an obvious inequity which has arisen in the administration of this provision, it has provided that incidental purchases made outside of the Western Hemisphere will not disqualify a corporation from the Western Hemisphere trade corporation credit if it is otherwise eligible for it.

[6] It may be noted that various suggestions were made with respect to the Western Hemisphere trade corporation legislation during the course of the hearings held before the House Ways and Means Committee and the Senate Finance Committee preliminary to the enactment of the Internal Revenue Code of 1954. Some of the suggestions were that the parenthetical phrase in section 921 be revised to read "other than purchases incident thereto"; that section 109 of the 1939 Code be amended to provide that the term "all of whose business is done" does not include purchasing in or incidental contact with any country outside the Western Hemisphere; and that section 109 should be amended to make it clear that the purchase of goods or other activity constituting only an incidental part of the corporation's general activities does not result in a loss of qualification. See Hearings before the Committee on Finance, United States Senate, 83d Cong., 2d Sess., on H.R. 8300, particularly statement, p. 876, on behalf of the National Foreign Trade Council, and Hearings before the Committee on Ways and Means, House of Representatives, 83d Cong., 1st Sess., on "Forty Topics Pertaining to the General Revision of the Internal Revenue Code," particularly statement, p. 1425, on behalf of the National Foreign Trade Council, and statement, p. 1464, of the Chamber of Commerce of the United States, submitted by a representative of the Motion Picture Association of America.

charged with its administration will not be disturbed except for weighty reasons. *Brewster* v. *Gage*, 280 U.S. 327, and cases therein cited. Since we are of the opinion that the regulations in question are not unreasonable or plainly inconsistent with the statute, we see no basis for concluding that they are invalid.

Here the purchases made by the petitioner in Hong Kong and Japan were certainly not minor in relation to the entire business of the petitioner, nor were they nonrecurring or unusual in character. Rather, they constituted a regular and substantial part of the business carried on by the petitioner. We accordingly hold that the petitioner was not a Western Hemisphere trade corporation during the year in question within the meaning of section 921 of the 1954 Code, and that it is not entitled to the special deduction provided in section 922.

*Decision will be entered for the respondent.*