**OTIS ELEVATOR COMPANY, a Maine Corporation,**

v.

**The UNITED STATES.**

No. 495–59.

United States Court of Claims.
April 4, 1962.

John C. Reid, Washington, D. C., for plaintiff. Ivins, Phillips & Barker, Washington, D. C., on the briefs.

Eugene Emerson, Washington, D. C., with whom was John B. Jones, Jr., Acting Asst. Atty. Gen., for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., on the brief.

Norton Kern, New York City, filed brief amicus curiae on behalf of American & Foreign Power Co., Inc. Reid & Priest, Washington, D. C., on the brief.

LARAMORE, Judge.

This is a suit to recover income taxes paid by the plaintiff for the year 1950 in the amount of $53,559.06, plus interest, on the theory that the taxpayer qualifies as a Western Hemisphere trade corporation.

The sole issue in this case is whether the taxpayer is entitled to the special credit under section 26(i) (2) of the Internal Revenue Code of 1939, 64 Stat. 906, 920, 26 U.S.C.A. § 26(i) (2), which provides:

"§ 26. Credits of corporations

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\*　　\*　　\*　　\*　　\*　　\*

"(i) [as added by § 122(c), Revenue Act of 1950, c. 994, 64 Stat. 906] Western Hemisphere Trade Corporations. In the case of a western hemisphere trade corporation (as defined in section 109)—

\*　　\*　　\*　　\*　　\*　　\*

"(2) *Calendar year 1950.*—In the case of a taxable year beginning on January 1, 1950, and ending on December 31, 1950, an amount equal to 33 per centum of its normal—tax net income computed without regard to the credit provided in this subsection."

Section 109 of of the Internal Revenue Code of 1939, 56 Stat. 798, 838, 26 U.S.C.A. § 109, defines Western Hemisphere trade corporations as follows:

"For the purposes of this chapter, the term 'western hemisphere trade corporation' means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions:

"(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

"(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business."

Treasury Regulations 111, section 29.-109–1, relating to the 1939 Code under which the deficiency was assessed and under which the Commissioner of Internal Revenue denied plaintiff's claim for refund, provides, *inter alia,* as follows:

"Sec. 29.109–1. *Western Hemisphere Trade Corporations.*—Under the provisions of section 15 a domestic corporation qualifying as a Western Hemisphere trade corporation is exempt from the surtax imposed upon corporations generally by section 15. To so qualify, the following tests must be met:

"(a) Its entire business must be carried on within the geographical limits of North, Central, or South America, or in the West Indies, or in Newfoundland; and

"(b) 95 percent or more of its gross income for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) must be derived from sources without the United States; and

"(c) 90 percent or more of its gross income for such period or such part thereof must be derived from the active conduct of a trade or business.

A domestic corporation is not excluded from the exemption merely because, incident to the conduct of its trade or business, it retains title in goods to insure payment for such goods shipped to a country outside the geographical areas enumerated in section 109.

"A corporation which claims exemption as a Western Hemisphere trade corporation shall attach to its income tax return a statement showing that its entire business is done in one or more of the designated countries, and for the 3-year period immediately preceding the close of the taxable year (or for such part thereof during which the corporation was in existence) (1) its total gross income from all sources, (2) the amount thereof derived from the active conduct of a trade or business, (3) a description of such trade or business and the facts upon which the corporation relies to establish that such trade or business was actively conducted by it, and (4) the amount of its gross income, if any, from sources within the United States. The gross income from sources without the United States and within the United States shall

be determined as provided in section 119 and the regulations prescribed thereunder."

Since there is no question that at least 95 percent of plaintiff's gross income was derived from sources outside the United States and at least 90 percent of its gross income was derived from the active conduct of a trade or business, the sole question here is whether all of its business was done in the Western Hemisphere countries, which includes the United States.

The facts are these: Plaintiff was organized under the laws of the State of Maine in 1924 as a wholly owned subsidiary of Otis Elevator Company, a New Jersey corporation.[1]

In the year in question (1950), and prior years, plaintiff was engaged in the business of installing and servicing elevators and escalators in various South and Central American countries. It had 10 branch establishments in these countries, which in 1950 had a total of 1,977 employees and a total payroll of $2,188,-464. It paid income taxes to the countries in which it had branches of $280,-821.77 in 1948, $187,265.30 in 1949, and $157,627.88 in 1950. Several of these branches had manufacturing facilities and the rest had installation and service facilities. Except for its New York office, which handled only administrative and accounting matters, plaintiff had no office or place of business other than the branch establishments above referred to.

Each branch listed in Table 1 (finding 3) conducted its business as if it were a separate entity, keeping its own books of account reflecting in foreign currency its assets, liabilities, income, and expense. The New York office maintained a separate set of books reflecting in terms of United States currency the investment in each branch and annual branch profits. The New York office utilized the staff of New Jersey in maintaining a separate set of books and records, and the cost of such services, including the use of office space,

---

1. The parent company will hereinafter be referred to as "New Jersey".

was charged to the plaintiff by New Jersey.

During the years 1948, 1949, and 1950 the plaintiff's parent, New Jersey, had facilities for the manufacture of elevator equipment in the United States and had wholly or partially owned foreign subsidiaries with manufacturing facilities in Canada, England, France, and Italy. These foreign subsidiaries were:

| Name | Country |
|---|---|
| Otis-Fensom Elevator Company, Ltd. (Name changed to Otis Elevator Company, Ltd. in 1949). | Canada |
| Waygood-Otis, Ltd......... | England |
| Ateliers Otis-Pifre, S.A..... | France |
| Stigler-Otis, S.A.I.......... | Italy |

When one of plaintiff's branches received an order for the installation or modernization of elevator equipment from a customer in its territory, it forwarded to New Jersey at its main office in New York an order for the various components needed for the job which were not available locally. New Jersey would then determine whether the components ordered by the plaintiff would be manufactured by New Jersey in its United States factories or whether some or all of the components could be more efficiently manufactured by one or more of its subsidiaries in Canada, England, or France, taking into account the production backlogs and manufacturing schedules of its own factories and those of its foreign subsidiaries. Other considerations taken into account by New Jersey in determining the place of manufacture were price, availability of currency for payment, and, in some cases, customer preference. After determining the place of manufacture, New Jersey would place an order or orders upon the factory or factories chosen for the manufacture, directing it or them to manufacture the special components and ship them to the plaintiff's branch which had the installation job. After manufacture, the components would be shipped direct to that branch by the factory or factories involved. The factory would then bill plaintiff's branch direct for the components shipped by it, and payment would be made direct by the branch to the factory. Except for the billing by the factory and the payment by the branch, there was normally no contact, by correspondence or otherwise, between the factory and the branch.

Approximately 30 percent of the components used by plaintiff were manufactured in its own South American plants or purchased from local suppliers. For the rest of its components, it looked to its parent, New Jersey, whose principal office was in New York and which had manufacturing plants in the United States and also had subsidiaries with manufacturing facilities in Canada, France, and England.

During the year 1950, the 70 percent of components used by plaintiff which could not be obtained locally were manufactured and shipped to plaintiff by New Jersey and/or one of its subsidiaries. The dollar value of these non-local purchases amounted to $1,997,851. Of this total, components of a dollar value of $319,671 were manufactured in England and/or France.

Plaintiff filed a timely income tax return for the year 1950 and computed its income tax liability on the basis that it qualified as a Western Hemisphere trade corporation under the provisions of section 109 of the Internal Revenue Code of 1939, supra, and that it was entitled to the credit provided by section 26(i)(2) of the 1939 Code, supra. Plaintiff reported a net income of $511,405.07 and an income tax liability of $139,159.39. It claimed a Western Hemisphere trade corporation credit in the amount of $168,-763.67, which reduced the net income to a surtax net income of $342,641.40. The income tax liability of $139,159.39 was offset in part by a tax credit for income taxes paid to a foreign country in the amount of $118,614.39. The balance due of $20,545 was paid with the filing of the return.

The Commissioner of Internal Revenue, upon audit of the plaintiff's tax returns for the years 1950 through 1954, determined that plaintiff did not qualify as a Western Hemisphere trade corporation on the ground that it had made substantial purchases in Europe and proposed deficiencies in income tax for such years by reason of the disallowance of the credit provided by section 26(i) of the Internal Revenue Code of 1939. On August 5, 1959, plaintiff paid $66,675.95, representing the deficiency in tax for the year 1950 resulting from such disallowance and other adjustments made by Commissioner of Internal Revenue, together with interest thereon of $33,568.-14.

On October 2, 1959, plaintiff filed, for the year 1950, a claim for refund of income tax in the amount of $53,559.06, plus interest. The grounds upon which the claim was based were that plaintiff qualified as a Western Hemisphere trade corporation and was entitled to the credit provided by section 26(i) of the Internal Revenue Code of 1939. On November 6, 1959, the Commissioner of Internal Revenue disallowed the claim for refund. This suit resulted.

If the invocation of a technical construction were dispositive of the controversy in this case, we would direct ourselves to the question whether or not plaintiff actually made purchases outside the Western Hemisphere. A determination that the plaintiff did not make any purchases outside this hemisphere would clearly and simply resolve the matter in plaintiff's favor. Therefore, we shall assume that plaintiff did engage in purchasing component parts, necessary for its operations, from outside the Western Hemisphere.

The issue before us then is did plaintiff's purchases amount to "doing business" so as to place plaintiff outside the statutory restriction of a corporation "all of whose business is done" in the Western Hemisphere. If plaintiff does not meet the statutory requirement, then it would be excluded from the tax exemption even though it were otherwise qualified.

Section 109 provides the general rule for determining whether a corporation qualifies for the exemption granted by section 26(i)(2). The language of section 109 might be susceptible to an interpretation that any business transaction conducted outside the Western Hemisphere would operate to exclude the transacting corporation from the exemption. Such an interpretation would lead to some absurd results. For instance, any minor transaction, whether a sale or purchase, would exclude the corporation from the benefits of the exemption. Suppose a corporation engaged solely in a business operation in Latin America, bought and sold all its necessaries in Latin America except barbed wire, which it could only acquire in Germany. We do not think Congress intended that this simple purchase should operate to deprive the corporation of the benefits of the statute. Neither do we agree with the argument advanced by the plaintiff that the phrase "all of whose business is done" in section 109 must be construed according to the generally accepted meaning of the phrase "doing business." In the cases cited by plaintiff in support of this view, the test of whether the party was "doing business" was applied for the purpose of obtaining jurisdiction over the party in a particular court. This is not the same test applied to determine whether a corporation is entitled to the provisions of a tax exemption statute. Since the language of the statute is ambiguous and vague, the proper interpretation of the statute should come from what we can discern as the intent of Congress at the time the statute was enacted. Fortunately, the legislative history surrounding section 109 is extensive, and it indicates that Congress recognized some economic contact with other nations would occur but that this should not deprive the corporations of the exemption. The Senate Finance Committee report, accompanying the House Report, in discussing the qualifications of a Western Hemisphere trade corporation, read in part:

" * * * In addition, the entire trade or business of such corporations must be carried on in the Americas or adjacent areas. However, merely incidental economic contact with other countries outside such geographical sphere will not place such corporations outside the exempt classification. For example, the A Corporation is engaged in mining activities in South America and in shipping its products to foreign countries outside the United States, including Great Britain. The mere fact that the A Corporation ships its goods to England, retaining title to such goods until acceptance of the bill of lading and draft in order to insure collection of the price, will not be considered as carrying on business outside the Western Hemisphere." (Senate Report No. 1631, 77th Congress, 2nd Session, 1942—2 Cum.Bull. 504, 588.

The Treasury regulations, supra, have their genesis in this report for they use substantially the same language and cite precisely the same example. It appears then that a definition of the phrase "merely incidental economic contact with other countries" as used in the report, or "incident to the conduct of its trade or business" as used in the regulations, would be helpful. "Incidental" could mean minor in relation to its entire business, as contended by the defendant. It could also mean an integral part of the conduct of its business or that which will naturally happen as a subordinate or subsidiary feature of its business, as contended by the plaintiff. See Webster's New Collegiate Dictionary (1960 Ed.).

The defendant insists that a correct definition would be reached by referring to 26 U.S.C. (I.R.C.1954) § 921 (1958 Ed.), which is the counterpart of section 109 in the 1954 Internal Revenue Code. However, we fail to see how subsequent legislation can be controlling in this matter, especially when the statute states:

" * * * For any taxable year beginning prior to January 1, 1954, the determination as to whether any corporation meets the requirements of section 109 of the Internal Revenue Code of 1939 shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning prior to January 1, 1954."

Thus we can find no merit in defendant's entreaty that we disregard the admonition of the statute, and we shall not do so.

The defendant urges that the decision of the Tax Court in Topps of Canada, Ltd. v. Commissioner, 36 T.C. 326, 336, involving a similar situation, should be followed by this court. We would like to quote at length from the Tax Court's opinion in that case, as follows:

"There remains the question of the proper construction of the term 'incidental purchases.' The statute itself does not define the term, and the committee reports with respect to the Revenue Bill of 1954 do not provide the answer. They merely state, in effect, that in order to correct an obvious inequity which had arisen in the administration of the Western Hemisphere trade corporation provisions, a change was being made to provide that 'incidental purchases made outside of the Western Hemisphere' will not disqualify a corporation if it is otherwise eligible. Such reports do not give examples of the administrative action which was considered inequitable.

"While the term 'incidental purchases' might be susceptible of the construction urged by the petitioner (purchases incident to its business), it certainly is not clear that such was the construction intended by Congress. On the other hand, it appears to us that such language is reasonably susceptible of the construction placed upon it in the regulations, namely, purchases which are minor in relation to the entire business or

nonrecurring or unusual in character. Such regulations specifically reject the construction of the statute urged by the petitioner."

In respect to the above, it is noted that the Tax Court was confronted with a situation arising under the 1954 Code. As we have pointed out, we are not concerned with an interpretation of the 1954 Code; however, insofar as the Tax Court's opinion can be related to our case, we are certainly interested in that court's decision. The Tax Court, confronted with an analogous definitive statement, held in effect that the term "incidental purchases" might mean purchases "incident to" its business, but they felt that the interpretation placed upon it by the regulations; viz., purchases which are minor in relation to the entire business, should prevail absent a clear mandate by Congress. The court, inferentially at least, relied on the definition in the regulations which they found to be reasonable. In the instant case we do not have such regulations to uphold. Since the Treasury regulations promulgated under the 1939 Code use the term "incident to" we might infer that the Tax Court would have reached a contrary decision if they relied on those regulations. In any event, the plaintiff in the instant case should prevail under either definition because its receipt of components from other than Western Hemisphere countries amounted to 6.2 percent of the corporation's gross receipts, a figure "minor" by any interpretation, and the language of the applicable regulations utilizes the term "incident to." Therefore, regardless of which definition we apply in the instant case, the plaintiff must recover, since it is our view that the "purchases" were minor and an integral part of its business.

We think this conclusion is compatible with what Congress intended when it enacted section 109 of the 1939 Code. The Senate Finance Committee report specifically stated that "incidental economic contact" was not to be considered doing business. Moreover, the illustration, in both the report and the Treasury regulations, provided that a transaction involving a sale to England was not intended to constitute doing business outside the Western Hemisphere. As defendant correctly points out, "purchasing is as much a part of doing business as selling." It would follow that if a transaction involving a sale with shipment to England was not intended to constitute doing business outside the Western Hemisphere, then a mere purchase from outside the Western Hemisphere, likewise, is not to be considered doing business outside the Western Hemisphere.

Section 109 was enacted into the 1939 Internal Revenue Code to encourage American corporations to engage in foreign trade, A. P. Green Export Co. v. United States, Ct.Cl., 284 F.2d 383. Were we to hold that a corporation, otherwise qualified, would be excluded from the exemption provided for by the statute, by a mere purchase outside the Western Hemisphere, we would effectively thwart a well-defined Congressional objective.

For the above stated reasons we hold that the plaintiff is entitled to recover, with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S. C.A.

It is so ordered.

JONES, Chief Judge, and DURFEE, and WHITAKER, Judges, concur.