Laramore, Judge,
delivered tbe opinion of tlie court:
This is a suit to recover income taxes paid by the plaintiff for the years 1951 through 1953 in the amount of $472,607.22, plus interest, on the theory that the taxpayer qualifies as a “western hemisphere trade corporation.”
The sole issue in this case is whether the taxpayer is entitled to the special credit under section 26 (i) of the Internal [Revenue Code of 1939. Revenue Act of 1950, ch. 994, 64 Stat. 906, 920, as amended, 26 U.S.C. §§26(i), 109 (1952 Ed.). The statute prescribes three conditions which must be met in order for a domestic corporation to qualify: At least 95 percent of gross income must be derived from sources outside the United States; at least 90 percent of gross income must be derived from the active conduct of a trade or business ; and lastly, all of its business must be done in the western hemisphere.
Concededly, plaintiff meets the first two of these conditions, and the only question is whether all of its business was done in western hemisphere countries which include the United States. All the facts except for the years involved, the figures showing the volume of business, number of employees, income of plaintiff’s branches in Latin America, are substantially the same as presented in the case of Otis Elevator Company v. United States, 157 Ct. Cl. 339, 301 F. 2d 320 (1962), which suit involved taxes paid for the year 1950. Also, the identical issue as before the court in Otis Elevator, supra, is present in this case.
During the years presently in issue, the cost of components, as a percentage of gross receipts, which were manufactured in Europe amounted to 8.4 percent in 1951, 16.9 percent in 1952, and 15.2 percent in 1953, as compared with 6.2 percent in 1950. Thus, the only problem before the court now is whether the higher percentages of components manufactured in Europe take this case without the reasoning in the 1950 case. In that case, we held that the plaintiff should prevail under either a test of “minor” or “incident to,” even though components purchased in Europe totalled 6.2 percent of gross receipts. 157 Ct. Cl. at 350; 301 F. 2d at 326. Similarly in this case, we think the purchases were not so substantial as *359 to deprive tlie taxpayer, otherwise eligible, of the right to the credit.
For the above stated reason, we hold that plaintiff is entitled to recover, with interest, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 47 (c) (2).
FINDINGS OF FACT
The court, having considered the facts as stipulated by the parties, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was organized under the laws of the State of Maine in 1924 as a wholly-owned subsidiary of Otis Elevator Company, a New Jersey corporation (hereinafter referred to as “New Jersey”), and has continued to be a wholly-owned subsidiary of New Jersey since its organization. The parent, New Jersey, has its main office in a building situated at 260 Eleventh Avenue in New York City, and the plaintiff’s only office in the United States is in the same building. Plaintiff’s tax returns for the years 1951,1952, and 1953 were filed with the District Director for the Second District of New York, and it keeps its books and files its tax returns on a calendar year basis.
2. During the years 1951 through 1953, plaintiff was engaged in the business of installing elevators and escalators in new and existing buildings, and of servicing, repairing, and modernizing such equipment. The income which plaintiff earned from installations was classified as “Gross Beceipts from Installations,” and the income earned from servicing, etc., as “Gross Beceipts from Service.” As part of its installation contracts, plaintiff agreed to provide maintenance service (inspection, lubrication, adjusting equipment at regular intervals, and replacing worn parts as needed) for a period of three months after completion of the installation. Normally, after the expiration of the three-month period, similar agreements, termed maintenance contracts, would be entered into under which plaintiff made a monthly charge for servicing such equipment, and this income was classified as gross receipts from service.
3. Plaintiff’s business, as described in finding 2 above, was carried on by branches located in various countries in South and Central America. Set forth below is a schedule showing, *360 for the years in suit, the location of these branches, the number of employees employed by each branch, and the payroll of each branch:

Plaintiff had no offices or other places of business other than its New York office (which handled only administrative and accounting matters) and the branches listed above. These branches engaged in installation and servicing, and the branch in Argentina also had some manufacturing facilities.
4. In accordance with normal branch accounting methods, each of plaintiff’s branch offices maintained books of account reflecting, in terms of the currency of the particular country in which it was located, its assets, liabilities, and income and expenses. Plaintiff’s New York office maintained a complementary set of books reflecting, in terms of United States currency, its investment in each branch and the annual profits of each branch. In maintaining these books and records, plaintiff’s New York office utilized the staff of its parent, New Jersey, and the cost for such services and for the use of office space was charged to the plaintiff by New Jersey.
5. During the years in suit, 1951 through 1953, all of plaintiff’s gross income (except for miscellaneous income in the amounts of $96,169.37, $38,421.52, and $54,806.96, respectively) was derived from payments received by its branches for the installation of elevators and escalators and for the servicing of such equipment in the countries in which its *361 branches were located. The amounts of such income as well as its gross receipts and costs were as follows:

During each of these years, as well as for the years 1949 and 1950, plaintiff derived more than 95 percent of its gross income from sources outside the United States, and derived more than 90 percent of its gross income from the active conduct of a trade or business.
6. During the years in suit, 1951 through 1953, plaintiff paid taxes to the countries in which it had branches (in the aggregate amounts of $191,645.05, $196,280.77, and $217,-816.61 respectively), and on its tax returns for those years it took and was allowed a f oreign tax credit relative to those amounts, which was applied against its United States tax liability.
7. During the years here involved, plaintiff’s parent, New Jersey, had facilities for the manufacture of elevator equipment in the United States and had wholly or partially owned foreign subsidiaries with manufacturing facilities in Canada, England, France, Germany, Italy, and Mexico. These foreign subsidiaries did business under the names, and in the countries, shown in finding 8 below.
8. Plaintiff’s branches used various “component parts” in connection with their installation of elevators and escalators. For example, for an elevator, some of the more costly component parts would be rails (upon which the elevator cab runs), hoisting machinery, and controllers, and some of the other component parts would be car frames, cabs, platforms, cables, signal devices, doors, sills, etc., as well as standard items which would include wiring other than cables, panels, and similar minor parts. Plaintiff’s branches, except those in Cuba and Peru, purchased some standard items locally, *362 and a small amount of other elevator components were manufactured by its branch in Argentina. However, most of the components used by plaintiff’s branches to fulfill their contracts were manufactured by its parent, New Jersey, in the United States or by one of the parent’s subsidiaries in Canada, England, France, Germany, Italy, or Mexico. During the years 1961 through 1953, plaintiff’s local purchases of standard items amounted to 18.8 per cent of its total purchases, while 81.2 per cent of the components purchased by the branches were manufactured by New Jersey or its affiliates in those countries. In dollar amounts, the component parts purchased by plaintiff’s branches are shown in the schedule below:

The cost of materials purchased by plaintiff’s branches which were manufactured by and shipped from factories located outside the western hemisphere (that is, New Jersey’s subsidiaries in England, France, Germany, and Italy) amounted to the following percentages of the plaintiff’s total purchases and gross receipts:

9. When one of plaintiff’s branches received an order for the installation or modernization of elevator equipment within its territory, it would prepare a purchase order detailing the requirements for the job (component parts, safety features, etc.) and forward it to New Jersey’s main office in New York City. New Jersey would then review it for correctness and determine where the components would be manufactured. *363 In determining where the components would be purchased, consideration ivas given to a number of factors: where they could be manufactured the cheapest (with particular regard to current labor costs), manufacturing schedules and production backlogs, the availability of currency for payment, and, in some cases, customer preference. After making the determination as to place of purchase, New Jersey would place orders with the factory or factories chosen (located in the various countries noted in findings 7 and 8 above) direciting it or them to manufacture the specific components and to ship them to the plaintiff’s branch making the installation. All shipments to plaintiff’s branches were made “FAS.” (“free along side” — the goods being delivered by the manufacturing company free to shipside) port of embarkation in the country of manufacture, the intention of plaintiff and New Jersey being to pass title to the goods shipped at the time they were loaded at that port. Any losses which might occur thereafter with respect to shipments, as well as insurance, consular fees, and shipping costs, would be charged to the branch making the purchase and borne by the plaintiff. Normally, there would not be any other contact between the factory which manufactured the components and the plaintiff’s branch to which they were shipped other than the billing of the branch by the factory and payment by the branch to the factory. New Jersey did not include in its purchases or sales for income tax purposes the shipments made to plaintiff’s branches of component parts manufactured by New Jersey’s subsidiaries.
10. The International Division of plaintiff’s parent, New Jersey, provided supervisory services for its foreign subsidiaries and affiliates and also for plaintiff’s branches. These services included technical and engineering services furnished to plaintiff, and for these services each of plaintiff’s branches paid New Jersey a fixed annual fee plus one per cent of its annual gross receipts from the installation and servicing of equipment.
11. The plaintiff filed timely income tax returns for the years 1951,1952, an'd 1953 with the District Director of Internal Revenue for the Second District of New York disclosing income tax liabilities of $55,254.08 for 1951, $115,- *364 557.13 for 1952, and $136,388.57 for 1953, which, liabilities were paid (together with interest of $3,270.74 on a delayed payment of 1950 taxes). On its returns, plaintiff computed its income tax liability based upon its contention that it qualified as a “western hemisphere trade corporation” under the provisions of section 109 of the Internal Eevenue Code of 1939 and was therefore entitled to the credit provided by section 26 (i) of the 1939 Code.
12. By agreements between the plaintiff and the Commissioner of Internal Eevenue pursuant to section 6501(c)!(4) of the Internal Eevenue Code of 1954, the latest of which was executed on April 19,1962, the period of limitations for additional assessments for the years involved was extended until June 30,1963.
13. The Commissioner off Internal Eevenue, upon audit of plaintiff’s returns for 1951, 1952, and 1953, determined that plaintiff did not qualify as a “western hemisphere trade corporation” and asserted deficiencies in tax based on the dis-allowance of the credit provided by section 26 (i) of the Internal Eevenue Code of 1939. On October 11,1962, plaintiff paid additional taxes, plus interest thereon, as follows:
Tear Wax Interest
1951_'_ $69,663.29 $43,968.03
1952 _____ 103,520.52 59,125.82
1953 ____ 108,951.70 55,690.74
These additional taxes represented the amounts due as a result of the Commissioner’s determination that plaintiff was not entitled to the credit provided by section 26 (i) of the' 1939 Code after taking into account certain offsetting tax adjustments in plaintiff’s favor.
14.On October 24, 1962, plaintiff filed claims for refund of income tax and interest, plus statutory interest thereon, as follows: *365 The ground upon which the ¡claims were based was plaintiff’s contention that it qualified as a “western hemisphere trade corporation” under section 109 of the Internal Revenue Code during the years involved and was therefore entitled to the credit provided by section 26 (i) of the 1989 Code.

*364

*365 15. On March 13,1963 the Commissioner of Internal Revenue rejected the claims for refund referred to in finding 14 above.
16. No action on this claim other than that described heretofore has been taken by plaintiff before the Congress of the United States or before any department of the government.
17. • Plaintiff is and always has been the sole and absolute owner of the claim described herein and no transfer or assignment of said claim or any part thereof has been made by plaintiff. '
. CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Rule 47(c) (2).
In accordance with the opinion of the court and a stipulation of the parties as to the amount of judgment, it was ordered on July 1, 1966, that judgment for the plaintiff be entered for $472,437.89.