OTIS ELEVATOR COMPANY, a
Maine Corporation,

v.

The UNITED STATES.

No. 427–75.

United States Court of Claims.

March 19, 1980.

John C. Reid, Washington, D. C., attorney of record, for plaintiff. Ivins, Phillips & Barker, Washington, D. C., of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen., M. Carr Ferguson, for defendant. Theodore D. Peyser, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and KASHIWA, Judges.

ON PLAINTIFF'S MOTION FOR PAR-
TIAL SUMMARY JUDGMENT AND
DEFENDANT'S CROSS MOTION
FOR PARTIAL SUMMARY JUDG-
MENT

KASHIWA, Judge:

This is an action for the recovery of an alleged overpayment by plaintiff of federal corporate income taxes in the amounts of $61,750.70, $173,151.11 and $366,743.41 for its fiscal years 1966, 1968 and 1969 respectively, plus assessed and statutory interest thereon. These amounts were paid as a result of a determination by the Commissioner of Internal Revenue ("Commissioner") that for its fiscal years 1962 through 1969, plaintiff did not qualify as a Western Hemisphere trade corporation ("WHTC") within the meaning of Internal Revenue

Code section 921.[1] The case is before this court on the parties' cross motions for partial summary judgment on the issue of plaintiff's WHTC status. Plaintiff asks us to find it was a WHTC during the period 1962 through 1969; defendant asks us to find the opposite. All the facts having been stipulated by the parties, there is no genuine issue as to any material fact. For the reasons stated below, we grant plaintiff's motion and deny defendant's motion.

Plaintiff was organized in 1924 under the laws of the State of Maine and has at all times since its incorporation been a wholly owned subsidiary of Otis Elevator Company, a New Jersey corporation (hereinafter referred to as "New Jersey"). Plaintiff keeps its books and files its federal corporate tax returns on the basis of a fiscal year ending September 30 of each calendar year.

During all periods relevant to this proceeding, plaintiff's business consisted of installing elevators and escalators in new and existing buildings and of repairing, modernizing and servicing elevator and escalator equipment. This business was wholly conducted in various countries in South and Central America, through branch establishments located in those countries. These branches used various elevator and escalator components in connection with the installation, repair, modernization and service of elevators and escalators. For example, when plaintiff installed a new elevator, it required such elevator components as rails (upon which the elevator cab runs), hoisting machinery, controllers, car frames, cabs, platforms, cables, signal devices, doors and sills. The amount and type of components used during a particular year was a function of the level and type of business being conducted by plaintiff during that year.

During the years here involved, New Jersey maintained facilities in the United States for the manufacture of elevator and escalator components. Plaintiff's Argentina branch also had certain manufacturing facilities. In addition, New Jersey had sub-

sidiaries located in France, Germany, Italy, Spain, the United Kingdom and South Africa (hereinafter referred to as the "European subsidiaries"), all of which possessed facilities for the manufacture of elevator and escalator components.

When plaintiff had a need for elevator or escalator components, plaintiff would itself manufacture some of them in its Argentina facility and order some from unrelated firms located in Central and South America. Most of the needed components could not, however, be acquired in this fashion. Those components which plaintiff did not either itself produce or acquire locally were obtained in the following ways.

During all of fiscal 1962 and 1963, and part of fiscal 1964, whenever a need for components arose, plaintiff would send to New Jersey a list of those required components which plaintiff could not itself produce or acquire locally. New Jersey would then review the list for technical accuracy and determine whether it or one of the European subsidiaries would manufacture these components. If a European subsidiary was chosen, New Jersey, acting as plaintiff's agent, would place an order with the selected subsidiary, directing it to produce the components and ship them directly to whichever of plaintiff's branches needed them. The order further provided that title to the components would pass from this subsidiary to plaintiff at the port of embarkation in the country of manufacture. This subsidiary would then bill plaintiff for the components, and plaintiff would sent payment directly to it.

All the companies involved—plaintiff, New Jersey and the European subsidiary which manufactured the components— treated the transaction as being directly between plaintiff and the particular European subsidiary. Although New Jersey placed the order, the transaction was in no way treated as a sale to it followed by a resale to plaintiff, nor did New Jersey at any time have title to these components.

---

1. Except where otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

During the remaining part of fiscal 1964 and all of fiscal 1965 through 1969, plaintiff continued to send to New Jersey lists of components which plaintiff could not itself produce or acquire locally. New Jersey continued to review the lists for technical accuracy and determine who would produce the components. If New Jersey chose a European subsidiary, New Jersey would still place an order with it, directing such subsidiary to ship the components to whichever of plaintiff's branches needed them. New Jersey, however, was no longer acting as plaintiff's agent. When New Jersey placed the orders, it was acting for its own account and the transaction was treated as a sale from the particular European subsidiary to New Jersey. The sale to New Jersey and passage to it of title to the components took place at the port of embarkation in the country of manufacture. Payment for the components was made by New Jersey to the manufacturing subsidiary, being indicated on the subsidiary's books in its local currency and on New Jersey's books at the then corresponding dollar amount.

In conformity with New Jersey's order, the components were shipped directly from the country of manufacture to the point of delivery in the country in which was located whichever of plaintiff's branches needed the components. New Jersey retained title to the goods while in transit and, as the owner, paid all freight, insurance and other transportation charges. Upon arrival at the point of delivery, the components were sold by New Jersey to plaintiff, with passage of title occurring at that time and place. Plaintiff paid New Jersey a dollar amount for the components equal to the total of the freight, insurance and other transportation charges and the dollar amount which New Jersey itself paid to acquire such components.

The net effect of the fiscal 1964 change in purchasing procedure was to shift the place where plaintiff took title to the components manufactured for it by the European subsidiaries. Prior to the change, since none of the European subsidiaries was located in the Western Hemisphere and since title passed to plaintiff at the port of embarkation in the country of manufacture, title to all such components passed to plaintiff outside of the Western Hemisphere. Subsequent to the change, plaintiff took title in either Central or South America, depending upon which of plaintiff's branches the components were shipped to. The change had no effect on New Jersey. Prior to the change, there being no purchase and sale of such components by New Jersey, it made no profit and suffered no loss on plaintiff's acquisition of components from the European subsidiaries. The effect was the same after the fiscal 1964 change; the amount New Jersey charged plaintiff exactly equaled the expenses incurred by New Jersey in acquiring and transporting the components.

For the period 1962 through 1969, the yearly dollar amount of plaintiff's purchases of components manufactured for it by the European subsidiaries, regardless of whether acquired from the European subsidiaries or from New Jersey, and the percentages which such purchases bore to plaintiff's gross receipts were as follows:

| Year | Purchases of European subsidiary manufactured components | Gross Receipts | Purchases of European subsidiary manufactured components as a percentage of Gross Receipts |
|---|---|---|---|
| 1962 | $1,347,394 | $8,982,068 | 15.0% |
| 1963 | 1,424,103 | 9,047,864 | 15.7 |
| 1964 | 1,329,175 | 8,323,071 | 16.0 |
| 1965 | 1,930,246 | 8,616,081 | 22.4 |
| 1966 | 2,352,953 | 9,857,321 | 23.9 |
| 1967 | 2,471,014 | 9,632,282 | 25.7 |
| 1968 | 1,830,147 | 12,045,877 | 15.2 |
| 1969 | 2,530,492 | 13,088,721 | 19.3 |

On its income tax returns for each of its fiscal years 1962 through 1969, inclusive, plaintiff considered itself to be a WHTC under section 921 [2] and in computing its tax

2. Section 921 reads as follows:

"SEC. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS.

"For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

liability claimed the special deduction provided by section 922.[3]

Upon audit of plaintiff's income tax returns for its fiscal years 1965 through 1969, the Commissioner determined that because of its purchase of components manufactured for it by the European subsidiaries, plaintiff did not qualify as a WHTC in any of its fiscal years 1962 through 1969. The Commissioner's position was that these purchases were of such magnitude that in none of these years was plaintiff a corporation "all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies,"[4] as required by section 921. The Commissioner did, however, agree that during all periods relevant to this proceeding, plaintiff derived more than 95 percent of its gross income from sources outside the United States and more than 90 percent of its gross income from the active conduct of a trade or business.

As a result of his denying plaintiff WHTC status, in recomputing plaintiff's income tax liability for fiscal years 1965 through 1969 the Commissioner eliminated the section 922 deduction for 1962 through 1969 and, because of the interrelationship of sections 922 and 904, reduced the section 904(c) (section 904(d) for taxable years beginning prior to January 1, 1976) foreign tax credit carryovers from fiscal 1962 and subsequent years. This resulted in assessment of the income tax deficiencies which plaintiff now seeks to recover. Plaintiff

paid the full amount of the deficiency, plus assessed interest.

■ As already indicated, the sole issue before us is determining whether plaintiff was a WHTC during any or all of its fiscal years 1962 through 1969. For a corporation to be a WHTC during any taxable year, it must in that year satisfy all four of the requirements set out in section 921. There being no question that in each of its taxable years 1962 through 1969 plaintiff met the "source of income" requirement of section 921(1) and the "active conduct of a trade or business" requirement of section 921(2), and by virtue of its Maine incorporation was a domestic corporation, the dispositive issue is to what extent, if any, during the period 1962 through 1969 plaintiff was a corporation "all of whose business (other than incidental purchase) is done in any country or countries in [the Western Hemisphere]." In those years in which plaintiff was such a corporation, all four requirements will be met and plaintiff will be a WHTC. It being undisputed that it is plaintiff's purchases of components manufactured for it by the European subsidiaries which cause doubt as to whether this one requirement is met, it is necessary to examine in some detail the meaning of this requirement in the context of a corporation's purchases of goods manufactured outside the Western Hemisphere. Treas.Reg. § 1.921–1(a)(1), which clarifies what is meant by a corporation "all of whose business (other than incidental purchases) is done in any country or

---

"(1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

"(2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business."

**3.** Section 922, to the extent here relevant, reads as follows:

"SEC. 922. SPECIAL DEDUCTION.

"(a) *General Rule.*—In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

"(1) First determine the taxable income of such corporation computed without regard to this section.

"(2) Then multiply the amount determined under paragraph (1) by the fraction—

"(A) the numerator of which is 14 percent, and

"(B) the denominator of which is that percentage which equals the highest rate of tax specified in section 11(b)."

\* \* \* \* \* \*

**4.** For the sake of convenience, "North, Central, or South America, or in the West Indies," as used in section 921, will hereinafter be collectively referred to as "the Western Hemisphere." Doing so has no effect on the outcome of this case.

countries in [the Western Hemisphere],"
aids us in our inquiry.[5]

■ Treas.Reg. § 1.921–1(a)(1) indicates
that the parenthetical expression "inciden-
tal purchases," as used in section 921, means
"incidental purchases outside the Western
Hemisphere." Reading this statement from
the regulation in light of its own examples
convinces us that as used therein "inciden-
tal purchases outside the Western Hemi-

sphere" is concerned with the place where
the purchase occurs and not with the place
where the goods in question were in fact
produced.[6] So interpreted the regulation
definition of "incidental purchases" really is
"incidental purchases made outside the
Western Hemisphere." Additional support
for this interpretation is contained in the
legislative history pertaining to the Internal
Revenue Code of 1954.[7]

**5.** Treasury Regulation 1.921–1(a)(1) reads as
follows:

"Reg. § 1.921–1 *Definition of Western Hemi-
sphere trade corporation.*

"(a) *In general.*—The term 'Western Hemi-
sphere trade corporation,' for purposes of sub-
title A of the Code means a domestic corpora-
tion which meets all of the following tests:

"(1) Its entire business for the taxable year is
carried on within the Western Hemisphere. In
determining whether this test is met, incidental
purchases outside the Western Hemisphere will
not disqualify the corporation. The term 'inci-
dental purchases' as used in section 921 and
this section does not have the same meaning as
the phrase 'purchases incident to the conduct
of the business.' The term 'incidental purchas-
es' means only purchases (of any kind and for
any purpose) which are (i) minor in relation to
the entire business or (ii) nonrecurring or un-
usual in character. Whether purchases made
outside the Western Hemisphere are incidental
purchases for purposes of section 921 and this
section shall be determined on the basis of all
the facts of each particular case, except that in
any case in which the aggregate of the purchas-
es (of any kind and for any purpose) made
outside the Western Hemisphere for the taxa-
ble year does not exceed an amount equal to 5
percent of the corporation's gross receipts from
all sources for such taxable year, such purchas-
es shall be deemed to be incidental purchases.
Merely incidental economic contact with coun-
tries outside the Western Hemisphere will not
disqualify a corporation as a Western Hemi-
sphere trade corporation. For purposes of this
section, the term 'Western Hemisphere' means
the countries in North, Central, and South
America, and in the West Indies."

**6.** Examples (2) and (3) in Treas.Reg. § 1.921–
1(b) show the circumstances in which purchas-
es of goods outside the Western Hemisphere
will cause loss of WHTC status. These exam-
ples read as follows:

"(b) *Illustration.*—The application of the
principles of paragraph (a) of this section may
be illustrated by the following examples:

   \*    \*    \*    \*    \*    .\*

"*Example (2).* Y, a domestic corporation, is
engaged in Argentina in the business of manu-
facturing and selling construction equipment.

During 1956, Y purchased in Germany certain
motor parts required as an integral part of the
equipment which it makes. The amount of
such purchases equalled 4 percent of Y's gross
receipts for 1956. Such purchases are inciden-
tal purchases and do not disqualify Y as a
Western Hemisphere trade corporation.

"*Example (3).* Z, a domestic corporation,
operates a mine in South America. During
1956, Z, in accordance with its usual practices,
purchased in France machinery and equipment
necessary in the conduct of its business. The
amount of such purchases was not minor in
relation to Z's entire business. Such purchases
disqualify Z as a Western Hemisphere trade
corporation."

In both examples, the place of purchase is
stated, but the actual place of manufacture of
the goods which were purchased is not. We
feel the omission in the examples as to the
place of manufacture to be significant. The
fact that in these examples the purchases oc-
curred in Germany and France does not neces-
sarily mean this is where the goods were pro-
duced. If the Treasury felt the place of manu-
facture to be significant, we feel this fact would
have been explicitly set forth in these exam-
ples. Rather than doing so, the place of pur-
chase was explicitly set out. The conclusion is
inescapable that, by wording these examples as
they did, the Treasury viewed the place of pur-
chase and not the place of manufacture to be
significant.

**7.** Discussing what became section 921, and
more specifically the parenthetical contained
therein, the Committee on Ways and Means
stated that "[t]o correct an obvious inequity
which has arisen in the administration of [the
Western Hemisphere trade corporation] provi-
sion, [the Committee] has provided that inci-
dental purchases *made* outside of the Western
Hemisphere will not disqualify a corporation
from the Western Hemisphere trade corpora-
tion credit if it is otherwise eligible for it."
H.R.Rep. No. 1337, 83d Cong., 2d Sess. 77,
*reprinted in* [1954] U.S.Code Cong. & Admin.
News, pp. 4017, 4104 (emphasis supplied). The
Senate Committee on Finance agreed with this
statement. S.Rep.No. 1622, 83d Cong, 2d Sess.
106, *reprinted in* [1954] U.S.Code Cong. & Ad-

■ Substituting our reading of the regulation definition for the statutory phrase "incidental purchases," the section 921 requirement in question becomes: a corporation "all of whose business (other than [incidental purchases made outside the Western Hemisphere]) is done in any country or countries in [the Western Hemisphere]." So viewed it consists of a requirement that a corporation do all of its business in the Western Hemisphere, coupled with an exception for incidental purchases made outside the Western Hemisphere. This must logically mean that purchases made outside the Western Hemisphere do not constitute doing business in the Western Hemisphere as "doing business" is defined for section 921 purposes. Were this not so, it would have been unnecessary to include an exception for purchases made outside the Western Hemisphere. Had such purchases constituted doing business in the Western Hemisphere, these purchases could not possibly have caused this requirement to not be met, making the exception unnecessary. While not free of doubt, the fact that the parenthetical exception deals only with purchases made outside the Western Hemisphere and the fact that such purchases do not constitute doing business in the Western Hemisphere, convince us that purchases made within the Western Hemisphere, regardless of the place of manufacture, do constitute the doing of business in the Western Hemisphere within the meaning of section 921. This means that in the context of a corporation, such as plaintiff, which purchases goods made outside of the Western Hemisphere the section 921 requirement at issue will be met only if either (1) the purchases, regardless of amount, occur within the Western Hemisphere or (2) the purchases occur outside the Western Hemisphere and do not rise above the level of "incidental purchases." It is, of course, important to note that in determining the place of purchase we look at the substance of the transaction, and do not automatically accept the taxpayer's characterization of the place of purchase. Determining the place of purchase for tax purposes is discussed in greater detail, *infra*.

The purchases of elevator and escalator components manufactured for it by the European subsidiaries being the only reason for denial of WHTC status, it is these purchases which we focus on. Our task is to determine whether for each of the years 1962 through 1969 such purchases either occurred within the Western Hemisphere or if they occurred outside the Western Hemisphere, did not exceed the level of "incidental purchases," as used in section 921. In those years in which either of these two conditions are met, plaintiff was a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]" and, therefore, was a WHTC.

■ While agreeing that in the context of a corporation which purchases goods produced outside the Western Hemisphere, the place of purchase is crucial in explaining the meaning of this section 921 requirement, and that such requirement will be met unless purchases made outside the Western Hemisphere exceed the level of "incidental purchases," plaintiff challenges the correctness of the Treas.Reg. § 1.921–1(a)(1) definition of "incidental purchases." Rather than meaning purchases which are "(i) minor in relation to the entire business or (ii) nonrecurring or unusual in character," plaintiff contends that "incidental purchases" as used in section 921 should be defined as "purchases incident to the conduct of the business." In plaintiff's view, purchases made outside the Western Hemisphere, if incident to the conduct of its business, must regardless of the level of such purchases always be considered to be "incidental purchases." Since Treas.Reg. § 1.921–1(a)(1) specifically rejects plaintiff's definition, we could agree with plaintiff only if we were to hold the regulation invalid to the extent it defines the phrase "incidental purchases." This we decline to do.

min.News, p. 4739. The use of the word "made" serves to emphasize that it is the place where the goods are purchased, not the place of manufacture of such goods, which is important.

While "incidental purchases" is susceptible to either plaintiff's or the regulation's definition, the definition adopted by Treas. Reg. § 1.921–1(a)(1) is a reasonable one and is consistent with section 921. Since "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948); *accord, Lykes Bros. Steamship Co. v. United States*, 206 Ct.Cl. 354, 369, 513 F.2d 1342, 1350 (1975); *Mott v. United States*, 199 Ct.Cl. 127, 136, 462 F.2d 512, 517 (1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 902, 34 L.Ed.2d 688 (1973), we therefore uphold the validity of the definition adopted by the regulation. In addition, Treas.Reg. § 1.921–1(a)(1) was published in 1957 in T.D. 6249, 1957–2 Cum.Bull. 436, as part of a series of regulations which were first issued under the new Internal Revenue Code of 1954. The definitions contained in this regulation thus constitute a contemporaneous construction of section 921 by those charged with administration of the Internal Revenue Code. For this additional reason, the regulation definition "should not be overruled except for weighty reasons." *South Texas Lumber Co., supra*, 333 U.S. at 501, 68 S.Ct. at 698. We perceive no such weighty reason. Finally, the Tax Court, in *Topps of Canada, Ltd. v. Commissioner*, 36 T.C. 326 (1961), was previously faced with the identical issue. The plaintiff in that case also contended that "incidental purchases" meant purchases incident to the conduct of its business. The Tax Court rejected this contention and upheld the validity of the definition contained in Treas. Reg. § 1.921–1(a)(1). *Id.* at 336–337. While Tax Court decisions are not binding on us, their similar resolution of this issue reinforces the correctness of our decision.

Upholding the validity of this regulation definition of "incidental purchases" means that if in any fiscal year plaintiff's purchases of European subsidiary manufactured components occurred outside the Western Hemisphere, the section 921 requirement in issue will be met in that year only if such purchases were "(i) minor in relation to [plaintiff's] entire business or (ii) nonrecurring or unusual in character."

In all of fiscal 1962 and 1963, and the portion of fiscal 1964 prior to the change in manner of acquisition, plaintiff's purchases of components produced for it by the European subsidiaries clearly occurred outside the Western Hemisphere. The sale and passage of title to plaintiff both occurring in the country of manufacture, this was sufficient to in substance place the situs of the purchases outside the Western Hemisphere. The sole question during this period is, therefore, whether these were "incidental purchases."

During each of the 8 years here in issue (fiscal 1962 through fiscal 1969), plaintiff purchased components manufactured by the European subsidiaries. In addition, as previously indicated, plaintiff routinely depended upon this source of supply. It was plaintiff's usual business practice to obtain from the European subsidiaries those required elevator and escalator components which plaintiff could not either produce itself or acquire locally. In light of this, we do not feel plaintiff's purchases of such components during the period prior to the change in purchase procedure were "nonrecurring or unusual in character." The purchases during the period prior to the fiscal 1964 change will thus be "incidental purchases" within the meaning of section 921 only if they were "minor in relation to [plaintiff's] entire business" carried on during this period.

While Treas.Reg. § 1.921–1(a)(1) does state that one of the definitions of "incidental purchases" is "purchases * * * which are * * * minor in relation to the entire business," this regulation nowhere contains a definition of "purchases * * * which are * * * minor in relation to the entire business." [8] Resort to two

---

8. While example (3) in Treas.Reg. § 1.921–1(b), quoted in full in footnote 6, *supra*, sets out a situation where purchases from outside the Western Hemisphere are not minor in relation to the entire business, we do not feel this example to be at all illuminating. This example does

prior decisions of this court, *Otis Elevator Co. v. United States,* 174 Ct.Cl. 357, 356 F.2d 157 (1966), and *Otis Elevator Co. v. United States,* 157 Ct.Cl. 339, 301 F.2d 320 (1962), does, however, furnish what we feel to be the proper test to use in defining this phrase.

Both prior *Otis* decisions involved this very same plaintiff, and the facts and issues were substantially identical to those in the present controversy. During the years in issue in the prior cases, plaintiff sent to New Jersey lists of components which plaintiff could not either produce itself or acquire locally. New Jersey decided whether it or one of the European subsidiaries would manufacture the components. If a European subsidiary was chosen, plaintiff would acquire the components under a procedure identical to that followed in the present case prior to the fiscal 1964 change. It was clear that plaintiff's purchases of the components manufactured for it by the European subsidiaries occurred outside of the Western Hemisphere. Though these cases arose under the Internal Revenue Code of 1939, the issue was the same as in the present case, namely, whether plaintiff was a WHTC notwithstanding plaintiff's purchases made outside of the Western Hemisphere of components manufactured for it by the European subsidiaries.

Section 109 of the Internal Revenue Code of 1939, which contained the then definition of WHTC, was in all respects except one identical to section 921 of the Internal Revenue Code of 1954.[9] Section 109 in part defined a WHTC as a corporation "all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland."[10] The corresponding provision in section 921 in part defines a WHTC as a corporation "all of whose business (*other than incidental purchases*) is done in any country or countries in [the Western Hemisphere]." (Emphasis supplied.) The absence of this parenthetical phrase from section 109 is the only difference between these 1939 and 1954 Code sections.

The "source of income" requirement of section 109(a) and the "active trade or business" requirement of section 109(b) being met in both prior cases, and it being clear that plaintiff was a domestic corporation, the real issue was whether, notwithstanding the purchases outside the Western Hemisphere of European subsidiary manufactured components, plaintiff was a corporation "all of whose business is done in any country or countries in [the Western Hemisphere]." The earlier of the two prior decisions articulated the law to be followed, the second case (the 1966 decision) relying on the holding established by the first opinion.

In deciding whether plaintiff met this section 109 requirement, this court in its 1962 decision looked in part to the legisla-

---

not indicate the dollar amount of the purchases made in France, the dollar amount of Z's total purchases of machinery and equipment, Z's total gross receipts, or any other information about Z's business. In view of this, we do not understand why the purchases in this example are not minor in relation to the entire business; and the example, accordingly, is no aid in determining when purchases outside the Western Hemisphere are minor in relation to the entire business.

9. Section 109 of the Internal Revenue Code of 1939 provided as follows:

"§ 109. *Western Hemisphere trade corporations.*

"For the purposes of this chapter, the term 'western hemisphere trade corporation' means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West In-

dies, or in Newfoundland and which satisfies the following conditions:

"(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

"(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business."

10. For the sake of convenience, "North, Central, or South America, or in the West Indies, or in Newfoundland" as contained in section 109 will hereinafter be collectively referred to as "the Western Hemisphere." Doing so has no effect on the outcome of this case.

tive history surrounding the 1939 Code. The Senate Finance Committee report, in discussing this requirement that a corporation do all its business in countries in the Western Hemisphere, read in part: "[T]he entire trade or business of such corporations must be carried on in the Americas or adjacent areas. However, *merely incidental economic contact with other countries outside such geographical sphere will not place such corporations outside the exempt classification.*" S.Rep.No. 1631, 77th Cong., 2d Sess., 1942–2 Cum.Bull. 504, 588. (Emphasis supplied.) We read this statement as evidencing a Congressional intent that there be an exception from the requirement that a corporation do all of its business in countries in the Western Hemisphere and that this exception was for economic contact with countries outside the Western Hemisphere which did not exceed the level of "merely incidental economic contact." So viewed, so long as a corporation had no more than merely incidental economic contact with countries outside the Western Hemisphere, it would still be considered to be a corporation "all of whose business is done in any country or countries in [the Western Hemisphere]." Since such economic contact could be in the form of purchases made outside the Western Hemisphere, with reference to the matter then before us we held that so long as plaintiff's purchases made outside the Western Hemisphere amounted to no more than "merely incidental economic contact" with countries outside the Western Hemisphere, plaintiff would still be a corporation "all of whose business is done in any country or countries in [the Western Hemisphere]." We were then forced to decide whether plaintiff's purchases did amount to more than "merely incidental economic contact."

The Government argued that "merely incidental economic contact" meant purchases outside the Western Hemisphere which were "minor in relation to [Otis'] entire

business." 157 Ct.Cl. at 348, 301 F.2d at 325. Plaintiff contended it meant purchases outside the Western Hemisphere which were "an integral part of the conduct of its business." *Id.* We compared the dollar value of plaintiff's purchases made outside the Western Hemisphere with the dollar value of plaintiff's total gross receipts and held that this resulting percentage was sufficiently small for plaintiff's purchases outside the Western Hemisphere to be considered both minor in relation to its entire business and an integral part of the conduct of its business.[11] *Id.* at 350, 301 F.2d at 326. Without the need to decide which definition was correct, but implicitly deciding that one or both definitions was correct, we were able to hold that plaintiff's purchases outside the Western Hemisphere did amount to no more than merely incidental economic contact with countries outside the Western Hemisphere.

In the second *Otis* opinion, the 1966 decision, the years 1951, 1952 and 1953 were at issue. The dollar cost to plaintiff of its purchases outside the Western Hemisphere of components manufactured for it by the European subsidiaries, expressed as a percentage of its gross receipts, was 8.4 percent in 1951, 16.9 percent in 1952 and 15.2 percent in 1953. The "only problem before the court [was] whether the higher percentages of components manufactured [and purchased] in Europe [took] this case without the reasoning in the 1950 case." *Otis Elevator*, 174 Ct.Cl. at 358, 356 F.2d at 158. We concluded these higher percentages did not take this case outside the holding of the 1962 *Otis* case (referred to as "the 1950 case" because 1950 was the year there in issue) and that, again without deciding which was the correct test, these percentages of 8.4, 16.9 and 15.2 were still small enough for such purchases outside the Western Hemisphere in all three years to be considered both minor in relation to and an

---

11. The year in issue in the first *Otis* decision was 1950. In 1950 plaintiff's purchases made outside the Western Hemisphere amounted to 6.2 percent of its gross receipts.

The formula used to determine this percentage was:

$$\frac{\text{Total dollar value of the corporation's purchases made outside the Western Hemisphere during any particular year}}{\text{Dollar value of the corporation's total gross receipts during that year}} \times 100$$

integral part of the conduct of plaintiff's entire business.

To summarize, our prior two cases together held that in the context of the 1939 Code there was an exception from the requirement that a corporation do all its business in the Western Hemisphere and that this exception was for purchases made outside the Western Hemisphere which amounted to no more than merely incidental economic contact with countries outside the Western Hemisphere. In addition, while we did not decide what the proper definition of "merely incidental economic contact" was, we did hold that it might be "purchases made outside the Western Hemisphere which are minor in relation to the corporation's entire business" and that the proper way to determine whether such purchases are "minor" is to compare the dollar value of the purchases made outside the Western Hemisphere with the corporation's dollar amount of gross receipts. We also held that a percentage of 16.9 was sufficiently low for such purchases to be "minor in relation to the corporation's entire business."

This present case involves the section 921 requirement of a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]." The prior *Otis* decisions involved the 1939 Code counterpart to this requirement, the only change being the addition of the parenthetical phrase, "other than incidental purchases." Treas. Reg. § 1.921–1(a)(1) represents the Treasury's view as to what Congress meant to accomplish by having this section 921 requirement include this parenthetical within it. Since this regulation is in its entirety reasonable and consistent with the language of this section 921 requirement, we uphold its validity in its entirety, *Commissioner v. South Texas Lumber Co., supra*, and therefore utilize it in ascertaining the Congressional purpose in including the phrase "other than incidental purchases."

Treas.Reg. § 1.921–1(a)(1) indicates that a corporation will meet the requirement of a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]" only if "[i]ts entire business for the taxable year is carried on within the Western Hemisphere. In determining whether this test is met, incidental purchases outside the Western Hemisphere will not disqualify the corporation." We read this quoted statement as indicating that the parenthetical "other than incidental purchases" was included in section 921 so as to make clear there was an exception from the requirement that a corporation do all its business in the Western Hemisphere and that this exception is for "incidental purchases outside the Western Hemisphere."

■ This regulation section also states that "[m]erely incidental economic contact with countries outside the Western Hemisphere will not disqualify a corporation as a Western Hemisphere trade corporation." Since this regulation as a whole deals with the effect on a corporation's possible WHTC status of purchases made outside the Western Hemisphere, the "economic contact with countries outside the Western Hemisphere" logically must refer to economic contact in the form of purchases made in countries outside the Western Hemisphere. So interpreted this statement becomes: "[purchases made in countries outside of the Western Hemisphere which amount to no more than] [m]erely incidental economic contact with countries outside the Western Hemisphere will not disqualify a corporation as a Western Hemisphere trade corporation." Comparing this statement, as interpreted, with the regulation statement that "incidental purchases outside the Western Hemisphere will not disqualify the corporation as a Western Hemisphere trade corporation," convinces us that both statements are articulating the identical concept. Both declare that a certain level of purchases made outside the Western Hemisphere will not disqualify the corporation as a WHTC. The only difference is one statement defines this level of purchases as "incidental purchases" whereas the other defines them as "purchases made in countries outside of the Western Hemisphere which amount to no

more than merely incidental economic contact with countries outside the Western Hemisphere." The identity of purpose, plus the fact that both statements are contained in the same paragraph in the same regulation, convinces us that "incidental purchases" as used in Treas.Reg. § 1.921–1(a)(1) is a shorthand expression for "purchases made in countries outside of the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere."

This in turn means that when this regulation indicates that the parenthetical in section 921 created an exception for "incidental purchases outside the Western Hemisphere," this is a shorthand way of saying the parenthetical was included so as to create an exception for "purchase made outside of the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere." That is, the parenthetical "other than incidental purchases" was added to the 1939 Code requirement of a "corporation all of whose business is done in any country or countries in [the Western Hemisphere]" so as to make clear there existed this exception from this 1939 Code requirement. But this exception under section 921 is identical to the exception which, even in the absence of such a parenthetical, we found to exist under section 109 of the 1939 Code. This in turn means that notwithstanding the addition of the parenthetical in the section 921 version of this requirement, the section 109 requirement, as interpreted by us in our prior two *Otis* decisions, is identical to what we find to be a reasonable interpretation of the section 921 requirement. Both statutes require that the corporation do all its business in the Western Hemisphere and both have the identical

exception from this requirement. Additional language has been added to the 1954 Code version but substantively no change in the law occurred.

The only difference between section 921 and its 1939 Code counterpart is with respect to the definition to be given to "purchases made outside of the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere." Whereas in the prior *Otis* decisions we did not definitively decide what the definition of this phrase was, the Treasury, in interpreting section 921, has. Treas.Reg. § 1.921–1(a)(1) provides that "[t]he term 'incidental purchase' means only purchases [made outside the Western Hemisphere] * * * which are (i) minor in relation to the entire business or (ii) nonrecurring or unusual in character." Our defining "incidental purchases" as used in this regulation to mean "purchases made outside of the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere" means that this above statement from the regulation is in reality setting out the definition of such a level of purchases made outside the Western Hemisphere. This means that whereas in the prior *Otis* decisions we said that purchases outside the Western Hemisphere which are minor in relation to the entire business or which are an integral part of the conduct of the business might be the definitions of "purchases made outside of the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere," the Treasury has declared that the former is one of the definitions and the latter is not.[12] The only other difference is that the

---

**12.** Treas.Reg. § 1.921–1(a)(1) contains the statement that "[t]he term 'incidental purchases' as used in section 921 and this section does not have the same meaning as the phrase 'purchases incident to the conduct of the business.'" We read "purchases incident to the conduct of the business" as referring to purchases which are an integral part of the conduct of the business.

In addition, this regulation begins its definition with the statement that "[t]he term 'incidental purchases' means *only purchases*" and then sets out the two alternative definitions. The use of the word "only" indicates a clear intention to adopt an exclusive definition. "Purchases made outside the Western Hemisphere which are an integral part of the conduct of the business" not being contained with-

Treasury adopted alternative definitions, and the other alternative definition, "purchases * * * which are * * * nonrecurring or unusual in character," was not even contemplated in our prior opinions.

In sum, both section 109 of the 1939 Code and section 921 of the 1954 Code contained the same requirement of a corporation "all of whose business is done in any country or countries in [the Western Hemisphere]"; and both contained the identical exception for purchases made outside the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere. In our prior decisions, we held that a proper definition of such a level of purchases might be "purchases made outside the Western Hemisphere which are minor in relation to the entire business" and that the proper way to determine whether such purchases are "minor in relation to the entire business" is to compare the purchases made outside the Western Hemisphere with the corporation's gross receipts. The Treasury has decided that "purchases [made in countries outside the Western Hemisphere] * * which are * * * minor in relation to the entire business" is one of the alternative definitions, but, as previously indicated, has failed to supply a definition of this level of purchases. Since section 109 and section 921 are in substance identical and "purchases made outside the Western Hemisphere which are minor in relation to the entire business" is relevant under both provisions, we feel the test used under the 1939 Code to determine when such purchases are minor in relation to the entire business is equally applicable in defining this level of purchases for purposes of Treas.Reg. § 1.921–1(a)(1).

■ We accordingly hold that in determining whether a corporation's purchases made outside the Western Hemisphere are "purchases * * * which are * * * minor in relation to the entire business," as this phrase is used in this regulation, the correct approach is to compare the dollar value of a corporation's purchases made outside the Western Hemisphere in a given year with its gross receipts in that year. If this percentage is sufficiently small, such purchases will be "minor in relation to the entire business." The same test being used under the 1954 Code, this also means that the percentages at issue in the earlier *Otis* decisions furnish a useful bench mark in seeing whether for purposes of Treas.Reg. § 1.921–1(a)(1) such percentages are sufficiently small for the purchases to be minor in relation to the entire business.[13]

in this exclusive definition, it cannot be one of the definitions of "incidental purchases."

Since we have indicated that "incidental purchases" is a shorthand reference to "purchases made outside the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere," these two statements from the regulation mean that "purchases which are an integral part of the conduct of the business" is not the proper definition of "purchases made outside the Western Hemisphere which amount to no more than merely incidental economic contact with countries outside the Western Hemisphere."

**13.** We note that even without resort to our prior *Otis* decisions, in the context of a corporation such as plaintiff, a comparison of the dollar value of purchases outside the Western Hemisphere with total gross receipts would still be the only proper approach. The regulation speaks of purchases which are "minor in relation to the *entire* business." (Emphasis supplied.) Since this regulation is concerned with purchases made outside the Western

Hemisphere, it is these purchases which are to be compared to the entire business.

Plaintiff's entire business is not the supplying to others of elevator and escalator components. Plaintiff's entire business is the installing and servicing of elevators and escalators. The components themselves are just a part of the entire business. The dollar value of plaintiff's total purchases of components would, therefore, not be a proper reflection of its entire business. For the same reason, the dollar value of plaintiff's purchases of components produced for it by New Jersey would also not represent plaintiff's entire business. Gross receipts, being the total dollar amount received for the installation and servicing of elevators and escalators, is the only proper measure of plaintiff's entire business.

To see whether plaintiff's purchases outside the Western Hemisphere are "minor in relation to the entire business," the dollar value of the purchases made outside the Western Hemisphere must, thus, be compared with the dollar amount of plaintiff's gross receipts.

■ The dollar value of plaintiff's purchases outside the Western Hemisphere of components produced for it by the European subsidiaries equaled 15.0 and 15.7 percent of the dollar amount of gross receipts in the years 1962 and 1963, respectively. The 1966 *Otis* decision held that a percentage of 16.9 was sufficiently small for purchases made outside the Western Hemisphere to be considered minor in relation to the entire business. Since the percentages for 1962 and 1963 are smaller than this percentage from the 1966 opinion, we hold that plaintiff's purchases outside the Western Hemisphere in 1962 and 1963 were, for purposes of Treas.Reg. § 1.921–1(a)(1), "minor in relation to the entire business" carried on in those two years. Plaintiff's purchases made outside the Western Hemisphere in these two years, therefore, were "incidental purchases" as that term is defined in the section 921 requirement in issue in this case. Accordingly, in 1962 and 1963 plaintiff was a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]."

■ The change in purchasing procedure was implemented during plaintiff's fiscal year 1964. This change did not alter the 1964 level of purchases of European subsidiary manufactured components. As will be discussed, *infra*, all it accomplished was to change the place where plaintiff's purchases of such components occurred. Prior to the change, plaintiff's purchases occurred outside the Western Hemisphere. Subsequent to the change, plaintiff's purchases occurred within the Western Hemisphere. Defendant contends that "[t]his [change in the place of purchase] disqualified [plaintiff] as a WHTC for 1964, since there is no provision in Section 921 for qualification on a part-year basis." As we read this, defendant argues that since the change in place of purchase occurred at some point other than the first or last day of fiscal 1964, for 1964 plaintiff cannot possibly be a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]." In addition to being totally unsupported, on the facts of this case this contention has no merit.

If plaintiff had delayed implementation of the change until the first day of 1965, there is no question that all of plaintiff's 1964 purchases of components would have occurred outside the Western Hemisphere. Had this happened, the dollar value of such purchases would have been only 16.0 percent of the dollar amount of its fiscal 1964 gross receipts. Relying upon the 1966 *Otis* decision, this percentage would be sufficiently small for such purchases to be "minor in relation to the entire business" carried on in 1964. Plaintiff would thus have met the requirement of a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]."

As previously discussed, purchases occurring within the Western Hemisphere cannot cause this section 921 requirement to not be met. Only purchases occurring outside the Western Hemisphere can cause this requirement to not be met. By assuming the change in purchase procedure did not occur until 1965, we are increasing the 1964 purchases occurring outside the Western Hemisphere and, therefore, making it harder for plaintiff to meet this requirement in 1964. If under this assumption plaintiff does meet this requirement, then we fail to see how a fiscal 1964 change in purchase procedure, which change would make it easier to meet this section 921 requirement, can alter this result. Notwithstanding the change in purchase procedure in fiscal 1964, we therefore hold that in 1964 plaintiff satisfied the section 921 requirement at issue in this case.

In all of plaintiff's fiscal years subsequent to 1964, with the exception of 1968, purchases of European subsidiary manufactured components expressed as percentages of gross receipts in each of these years are significantly higher than the percentage guidelines articulated in the 1966 *Otis* decision. If we were to ignore the change in purchase procedure in determining plaintiff's possible WHTC status in the years 1965 through 1969, we could not so easily

hold that plaintiff meets the section 921 requirement at issue. This makes it necessary in ascertaining plaintiff's status during the period subsequent to fiscal 1964 to fully take into consideration the change in purchase procedure.[14]

As previously discussed, it is only purchases made outside the Western Hemisphere which can cause plaintiff to not be a corporation "all of whose business (other than incidental purchases) is done in any country or countries in [the Western Hemisphere]." Purchases which for tax purposes are considered made within the Western Hemisphere, regardless of the place of manufacture of the item purchased, will not cause this requirement to not be met.

■ Subsequent to the change in purchasing procedure, all sales to plaintiff of European subsidiary produced components, in form at least, occurred in the Western Hemisphere. Title passed to plaintiff in the Western Hemisphere, and place of title passage determines the place of sale. *A. P. Green Export Co. v. United States*, 151 Ct.Cl. 628, 284 F.2d 383 (1960); *Commissioner v. Pfaudler Inter-American Corp.*, 330 F.2d 471 (2d Cir. 1964); *Commissioner v. Hammond Organ Western Export Corp.*, 327 F.2d 964 (7th Cir. 1964). Logically, the place of sale to plaintiff must also be the place of purchase by plaintiff. This means that in form all of such purchases by plaintiff occurred in the Western Hemisphere. If we were to simply look to change in procedure, we would hold that subsequent to the change plaintiff made no purchases outside the Western Hemisphere. Plaintiff would, therefore, meet this section 921 requirement during its fiscal years 1965 through 1969, inclusive.

Our inquiry is, however, not this simple. When place of purchase is relevant to some purpose of the Code, as it is here, we not only must determine where the purchase in form occurred, we must also ascertain whether the place of purchase is to be respected for tax purposes. *See A. P. Green Export Co., supra.* In that case we had to decide whether the place of sale would be given effect for tax purposes. As we there stated:

Why the parties in the present case wished to make the sales as they did is one thing, but that is irrelevant under the *Gregory* case [*Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935)] so long as the consummated agreements were no different than they purported to be, and provided the retention of title was not a sham but had a commercial purpose apart from the expected tax consequences. * * * [*Id.* 151 Ct.Cl. at 640, 284 F.2d at 390.]

The place of sale, and thus also the place of purchase, will therefore be given effect in determining plaintiff's WHTC status for fiscal 1965 and subsequent years only if these *A. P. Green* requirements are met.

It is, however, not clear how many requirements were meant to be set out in *A. P. Green*. The uncertainty arises from the phrase "and provided the retention of title was not a sham but had a commercial purpose apart from the expected tax consequences." We are not sure whether this phrase means it necessarily follows that if retention of title was not a sham then a commercial purpose must have been served, or whether "sham" and "commercial purpose" are unrelated concepts so that the retention of title could at the same time not be a sham and also not serve a commercial purpose. If the former interpretation is correct, then this phrase defines a single requirement, which can be met by showing either the absence of sham *or* the presence of a commercial purpose. If the latter is correct, then for place of sale to be respected, the taxpayer must show absence of sham *and* presence of a commercial purpose. Since under either interpretation it must still be shown that "the consummated agreements were no different than they purported to be," *A. P. Green* can be viewed as articulating either a two- or a three-part

14. While we could potentially determine plaintiff's status for fiscal 1968 under the approach followed for 1962 through 1964, the subsequent

discussion of the effect of the change in purchase procedure makes this unnecessary.

test which must be met for the place of sale, and thus also place of purchase, to be respected for tax purposes.

In the context of this case, if there is a two-part test it must be shown that: (1) title did in fact pass to plaintiff in the Western Hemisphere and (2) passing title there was not a sham or served a commercial purpose other than tax avoidance. If it is a three-part test which must be met, then: (1) title must in fact pass to plaintiff in the Western Hemisphere, (2) the passing of title there must not be a sham and (3) the passing of title there must serve a commercial purpose other than tax avoidance. It is, however, unnecessary for us on these facts to decide whether *A. P. Green* stands for a two- or three-part test. The change in purchase procedure so as to pass title to plaintiff in the Western Hemisphere passes muster under either type of test.

Prior to the change, title to the components passed to plaintiff at the port of embarkation in the country of manufacture. The sale occurred at that time. Risk of loss also at that point shifted to plaintiff. If the components were damaged or destroyed while in transit to whichever of plaintiff's branches needed the components, the sale had nevertheless still occurred and plaintiff had to bear whatever loss there may have been. Subsequent to the change, New Jersey bore the risk of loss from the port of embarkation until transfer of title to plaintiff at the point of entry in the country of plaintiff's branch which needed the components. If the components were lost or damaged while in transit, New Jersey would have to bear this loss. In addition, if for some reason the components failed to arrive at the point of delivery, then no sale to plaintiff would occur.

The shifting from plaintiff to New Jersey of the risk of loss while in transit means that passing of title in the Western Hemisphere was not a sham. *See Commissioner v. Pfaudler Inter-American Corp., supra*; *Commissioner v. Hammond Organ Western Export Corp., supra*; *Barber-Greene Americas, Inc. v. Commissioner*, 35 T.C. 365 (1960). We also find the change in the place of title passage served a valid commercial purpose. A desire to shift the risk of loss from one corporation to another and to have a sale to plaintiff occur only if the components in fact arrive at the point of delivery surely serves a commercial purpose. Finally, the parties have agreed that title did in fact pass to plaintiff in the Western Hemisphere.

The either two- or three-part test being met, the place of sale, and hence of purchase by plaintiff, will be given effect for tax purposes. This means that for 1965 and all subsequent fiscal years, plaintiff made no purchases outside the Western Hemisphere. For the years 1965 through 1969, plaintiff is, therefore, a corporation "all of whose business (other than incidental purchases) is done in any country or countries [in the Western Hemisphere]."

Our previously holding that plaintiff met this requirement for the years 1962 through 1964, this means plaintiff met this requirement in all the years in issue in this case. Since plaintiff would be a WHTC under section 921 in each year in which this one requirement was met, we hold plaintiff to be a WHTC during all the years 1962 through 1969, inclusive.

## CONCLUSION

For the foregoing reasons, we grant plaintiff's motion for partial summary judgment and deny defendant's motion for partial summary judgment. The amount of plaintiff's recovery will be determined by subsequent proceedings pursuant to Rule 131(c).